James E. PARIS, Appellant,

v.

UNITED STATES, Appellee.

Tyrone A. DRIVER, Appellant,

v.

UNITED STATES, Appellee.

Nos. 84–1460, 85–272.

District of Columbia Court of Appeals.

Submitted June 11, 1986.

Decided Sept. 22, 1986.

Steven H. Goldblatt, Supervising Atty., Lesley Fair, Appellate Law Fellow, and Robert Potter, Law Student Counsel, were on brief for appellant Paris.

Patricia Stewart, Fairfax, Va., appointed by this court, was on brief for appellant Driver.

Joseph E. diGenova, U.S. Atty., and Michael W. Farrell, Thomas J. Tourish, Jr., Daniel M. Cisin, and Daniel S. Seikaly, Asst. U.S. Attys., Washington, D.C., were on brief for appellee.

Before MACK and TERRY, Associate Judges, and REILLY, Senior Judge.

TERRY, Associate Judge:

Both appellants were convicted of armed robbery,[1] assault with intent to commit robbery while armed,[2] and assault with intent to kill while armed;[3] appellant Driver was also convicted of carrying a pistol without a license.[4] On appeal they present three arguments for reversal. First, they maintain that the evidence was insufficient to sustain their convictions of armed robbery and assault with intent to commit robbery while armed because there was no direct evidence that either of them was armed during the commission of the robbery. Second, appellants contend that the trial court erred in admitting hearsay evidence of a witness' extra-judicial identifications. Third, appellant Driver asserts that the trial court erred in failing to exclude, *sua sponte*, certain allegedly suggestive and unreliable identification evidence against him. We reject all three arguments and affirm the convictions.

I

On August 27, 1982, two Metropolitan Police officers, Frederick Panzo and Brian Bender, were assigned to stake-out duty at the Fort Carroll Market, a small neighborhood grocery store in Southeast Washington. Their hidden observation post in the rear of the store was so small that it could accommodate only one officer at a time, who would watch the public area of the store through a small opening in the wall. At about 6:30 p.m., while Officer Panzo was taking his turn in the observation post, a robbery occurred.

Charles Wilcox, a store employee, was working behind the meat counter when a man approached him and asked for two lottery tickets.[5] A second man came up and purchased another ticket, then stepped back from the counter and scratched the ticket to see if he had a winning number.[6] A moment later, Boley Zywusko, the owner of the store, was standing near the entrance when he felt an "extremely hard" object thrust into his ribs. Mr. Zywusko was told by the man holding this object not to turn around, and to proceed to the rear of the store. He obeyed, but raised his hands in the air, thereby giving a pre-arranged signal to the stake-out officers and Mr. Wilcox that a robbery was in progress. When Mr. Zywusko reached the back of the store, he turned and faced his assailant, whom Mr. Wilcox meanwhile had recognized as the same man who had just purchased two lottery tickets.

By this time the second man had moved around the meat counter. As he passed behind Mr. Wilcox, he said, "Don't move, just stand still." He then grabbed the coffee can and a purse belonging to another employee, Fern Brown, which had been

---

1. D.C.Code §§ 22–2901, 22–3202 (1981).

2. D.C.Code §§ 22–501, 22–3202 (1981).

3. D.C.Code §§ 22–501, 22–3202 (1981).

4. D.C.Code § 22–3204 (1981).

5. Mr. Wilcox was authorized to sell lottery tickets from his meat counter. He placed all receipts from the sale of these tickets in a two-

pound coffee can, which was kept behind the counter in lieu of a cash register.

6. Officer Panzo had noticed the two men coming into the store with their jackets zipped up, which made him suspicious because it was a warm August evening. Panzo immediately alerted Officer Bender to their presence.

in a drawer behind the counter. The two men ran out the front door and fled toward a nearby alley, with the two police officers in hot pursuit. As they ran, both officers identified themselves and ordered the two men to stop. But they did not stop; instead, they entered a red car which was parked in the alley, and one of them pointed a large revolver out the window and fired it at Officer Panzo. Both officers returned the fire as the car sped off. At the end of the alley the car crashed into another car, and its two occupants jumped out and escaped on foot.

Although the officers were unable to catch the fleeing robbers, they did recover the coffee can and Mrs. Brown's purse from the wrecked car. The coffee can contained $39 in cash, including some change. Also recovered from the back seat of the car were a brown knapsack and a jacket. The knapsack contained an address book and numerous papers bearing the name of appellant Driver. Meanwhile, a bystander (unidentified in the record) found a revolver in the alley along the route which the red car had traveled. He picked it up by inserting a wrench through the trigger guard and brought it over to the officers. This gun was later test-fired and found to be operable.

The ensuing police investigation yielded two additional eyewitnesses, Vincent Branch and Preston Hamlet. Mr. Branch had just parked his car in the alley near the grocery store and was on his way to pick up his girl friend, who lived in a nearby apartment. Standing beneath her second-floor window, he had just called to her to find out if she was ready to leave when suddenly he saw two men run into the alley, one of them carrying a can with some change in it. Both men jumped into a red Granada that was parked in the alley, one

telling the other to get into the back seat. Branch then saw two police officers run into the alley with their guns drawn, ordering the other men to stop. Almost immediately there was an exchange of gunfire,[7] and Branch dropped to the ground and crawled behind a brick wall to avoid being hit by a stray bullet. The red car started to move, but it did not get very far; "they drove it ... down the alley, swerved and hit a trash can, and that was it." The men in the car, Branch testified, "took off ... [and] went around the bend."

Preston Hamlet, who lived a short distance from the Fort Carroll Market, heard gunshots and then the sound of a crash coming from the alley. When he went to his front door and looked out toward the alley, he saw that one car had crashed into the rear of another car. The first car had some bullet holes in it, and both the windshield and the rear window were damaged. Steam was coming from the wreckage. Mr. Hamlet then saw a man running toward him from the damaged car. The man passed within fifteen feet of Mr. Hamlet before running between his house and that of his neighbor.

The next day, August 28, Detective Renager Lee of the Robbery Branch assembled an array of nine black and white photographs. One of them was a picture of appellant Driver, whose name had been found on some of the papers in the knapsack. Lee showed this array to Mr. Hamlet, who picked out Driver's photograph as depicting the man who had run past his house.[8] Hamlet thought he could be more certain, however, if he saw color photographs. Accordingly, on September 3 he was shown ten color slides at police headquarters. From these slides Hamlet again selected Driver. Finally, at a lineup held on September 14, Hamlet identified Driver

7. Branch said that the first shot came from the car.

8. A photograph of Ian Williams, whose name also appeared on some of the papers in the knapsack, was included in the array. When the array was shown to Mr. Zywusko, the owner of the market, he chose Williams' photo as having the closest resemblance to one of the robbers, though he could not say that he was one of the robbers. The papers in the knapsack indicated that Williams and Driver had the same mother and father.

after first stating that he was "not sure" whether he could identify anyone from the lineup.[9]

Detective Lee also showed the black and white array to Vincent Branch on September 3. Lee testified that Branch selected Driver's photograph as depicting the man carrying the can with the change in it. About two weeks later, having learned through a check of the license number that the red car was registered to appellant Paris, Detective Lee showed Mr. Branch a group of color photographs which included one of Paris. Branch selected Paris' picture and said that it looked like the driver of the car. Finally, Branch identified both Driver and Paris from separate lineup photographs.[10]

Mr. Wilcox, the robbery victim, identified a picture of appellant Paris from a photographic array as the one most closely resembling the robber. He also identified Paris from a lineup photograph. Mr. Zywusko could not make an in-court identification of either appellant, but he did tentatively identify Paris from a photograph prior to trial.

Both appellants presented alibi defenses, but to no avail. The jury found them guilty on all counts, except that Paris was acquitted of the charge of carrying a pistol without a license.

## II

Appellants contend that the counts charging them with armed robbery and armed assault with intent to commit robbery should not have gone to the jury because there was no direct evidence that they were armed at any time while they were in the store. In reviewing challenges to the sufficiency of the evidence, however, "we must view the evidence in the light most favorable to the government, mindful of the jury's right to determine credibility, weigh the evidence, and draw justifiable inferences of fact." *McClain v. United States*, 460 A.2d 562, 567 (D.C.1983) (citations omitted). There is no legal distinction between direct and circumstantial evidence, *Hall v. United States*, 454 A.2d 314, 317 (D.C.1982), and reversal is warranted "only where there is no evidence upon which a reasonable mind could infer guilt beyond a reasonable doubt." *Head v. United States*, 451 A.2d 615, 622 (D.C.1982) (citations omitted); *see also Murchison v. United States*, 486 A.2d 77, 81 (D.C.1984). Tested by these standards, appellant's claim of evidentiary insufficiency is clearly without merit.

■ Although no one actually saw a weapon during the commission of the robbery, the evidence was clearly sufficient to permit the jury to infer that appellant Driver, at least, was armed. Paris was the one whom Mr. Wilcox identified as the actual robber, which meant that Driver was the one who came up behind Mr. Zywusko and thrust an "extremely hard" object into his ribs. Driver told Mr. Zywusko not to turn around and ordered him to move to the rear of the store. Officer Panzo noticed that both appellants entered the store in zipped-up jackets on a warm August evening, and Mr. Wilcox observed that Zywus-

9. On cross-examination at trial, Detective Lee was asked whether Mr. Hamlet had actually picked two photographs from the black and white array. Lee said that Hamlet selected Driver's photograph, saying that it looked like "the one that he believed was trying to run through his yard," but that he also set a picture of Kevin Saunders to one side, on top of the stack of remaining photographs. Detective Lee had not mentioned anything about Saunders' photograph at the pre-trial suppression hearing. When the trial judge asked why he had omitted this fact, he said that Mr. Hamlet was more certain in his recognition of Driver than of Saunders. The color slides subsequently shown to Hamlet included a picture of Driver, but not of Saunders (who was not a suspect in the case), because there was no color slide of Saunders in the police files. At trial Hamlet himself recalled selecting only one photograph from the black and white array: that of Driver.

10. Mr. Branch testified at trial and in general corroborated Detective Lee's testimony. He said that the photographs he selected from the two arrays looked "something like" the men he had seen in the alley.

ko's assailant (Driver) kept his right hand in his jacket pocket as he marched Zywusko to the rear of the store. Immediately after the robbery, the officers chased both appellants into the alley, where they got into a parked car. One of them pointed a revolver out the left rear window of the car and opened fire. Since Mr. Branch identified Paris as the driver of the car, Driver would have been the one who got into the back seat and hence the one who fired the gun at Officer Panzo. The revolver, later recovered in the alley, was test-fired and found to be operable.[11]

On this evidence a reasonable trier of fact could readily infer that the "extremely hard" object which was thrust into Mr. Zywusko's ribs was the revolver subsequently used in the shootout with the police. Permitting the jury to draw such an inference is not only reasonable, but strongly supported by the case law. *See Boyd v. United States*, 473 A.2d 828, 832 (D.C.1984) (conviction of armed rape upheld when victim testified that defendant "put a knife to my throat," even though she never saw the knife, and even though an examining physician found no scratches or marks on her neck); *Meredith v. United States*, 343 A.2d 317, 320 n. 5 (D.C.1975) ("Testimony that an object which appeared to be a gun was involved is sufficient to show use of a dangerous weapon"); *see also State v. Harrigan*, 447 A.2d 1194, 1196 (Del.Super.), *aff'd*, 447 A.2d 1191 (Del. 1982) (armed robbery conviction upheld when evidence showed that defendant thrust his hand into his coat pocket while demanding money and threatening to shoot victim); *State v. Talbert*, 416 So.2d 68 (La. 1982) (armed robbery conviction upheld when evidence showed only that defendant pressed an unknown object against victim's back while demanding money); *cf. United States v. Prater*, 149 U.S.App.D.C. 188, 462

F.2d 292 (1972) (defendant convicted as an aider and abettor of assault with intent to commit robbery while armed; conviction affirmed even though actual assailant was not arrested and no gun was ever found).

▮ Direct evidence that a dangerous weapon was used is not necessary to a conviction of an armed offense; circumstantial evidence will suffice. In this jurisdiction, any object which the victim perceives to have the apparent ability to produce great bodily harm can be considered a dangerous weapon. *Harris v. United States*, 333 A.2d 397, 400 (D.C.1975). In this case Mr. Zywusko plainly believed that the "extremely hard" object thrust into his ribs was a gun, an inherently dangerous weapon which gave his assailant the apparent ability to inflict great bodily harm. *See Robinson v. United States*, 506 A.2d 572, 575 (D.C.1986); *Williamson v. United States*, 445 A.2d 975, 978–979 (D.C.1982). This alone was sufficient to support the finding that his assailant was armed with a dangerous weapon. Even if the object had turned out not to be a loaded gun, the evidence would still have been sufficient for the jury to conclude that appellants were armed with a dangerous weapon. *See, e.g., McLaughlin v. United States*, —— U.S. ——, 106 S.Ct. 1677, 90 L.Ed.2d 15 (1986) (unloaded gun is a dangerous weapon); *Meredith v. United States, supra*, 343 A.2d at 320 (blank or unloaded pistol is a dangerous weapon when used as weapon in an assault). Thus we hold that the evidence at trial was sufficient to sustain appellants' conviction of armed robbery and armed assault with intent to commit robbery.

### III

▮ Appellants next contend that the trial court erred in permitting Detective

---

**11.** Although the man who found the revolver was not identified and did not testify, Vincent Branch's testimony was sufficient to permit the jury to infer that this was the gun which Driver fired at Officer Panzo. Branch, who was in the alley throughout the entire incident, said that after the red car had crashed, "[t]here was a gun

... laying down in the alley. Some dude came up there, and ... he took it and gave it to the police." This testimony meshed with that of Officer Bender, who said that after the suspects had fled, he was approached by "a civilian" who was carrying a revolver "by sticking a wrench in the trigger guard."

Lee to testify about Vincent Branch's out-of-court identifications because Lee's testimony constituted inadmissible hearsay. In the District of Columbia, however, a witness' testimony about someone else's out-of-court identification of an accused is admissible as substantive evidence under the prior identification exception to the hearsay rule. *Warren v. United States*, 436 A.2d 821, 837 (D.C.1981); *Morris v. United States*, 398 A.2d 333, 337–338 (D.C.1978); *Clemons v. United States*, 133 U.S.App. D.C. 27, 40, 408 F.2d 1230, 1243 (1968) (en banc), *cert. denied*, 394 U.S. 964, 89 S.Ct. 1318, 22 L.Ed.2d 567 (1969). The rationale for this exception is twofold:

> First, because the hearsay evidence is offered to corroborate the eyewitness testimony at trial, the declarant of the hearsay is available at trial for cross-examination which obviates the principal danger in admitting hearsay evidence.... Second, the extra-judicial identification may be more reliable as an identification and thus more probative of identity than an in-court identification of the defendant.

*In re L.D.O.*, 400 A.2d 1055, 1057 (D.C. 1979) (citations and footnote omitted). However, if the declarant were to testify that "he was not the least bit positive when he selected appellant's photograph from the array," then the hearsay exception would not apply because the "predicate identification [would be] rendered unreliable...." *Id.*

Appellants invoke our *L.D.O.* decision to support their argument that Detective Lee should not have been allowed to testify about Mr. Branch's identifications. Their reliance is misplaced. *L.D.O.* is a very unusual case whose holding is limited by its facts. In this case, as in most cases and quite unlike *L.D.O.*, Mr. Branch was far from uncertain in his pre-trial identifications of both appellants. His trial testimony about the identifications was consistent with that of Detective Lee. Branch testified that he selected appellants' photographs from the arrays which Lee showed to him. Although Branch did not say he

was absolutely certain that the photos he picked out were of the two men he saw in the alley, he did confirm that they looked "something like" them. Often this is the best one can hope for in a photographic identification; it certainly is enough to make Branch's identifications admissible and to differentiate this case from *L.D.O.* As we said in a later case, our holding in *L.D.O.*, which ruled inadmissible a police officer's testimony about an out-of-court identification by a robbery victim, "rest[ed] upon the fact that the complainant *disavowed at trial* his pretrial out-of-court identification of the defendant." *Rice v. United States*, 437 A.2d 582, 583 (D.C. 1981) (emphasis in original). Mr. Branch's testimony in the instant case certainly did not amount to a disavowal or repudiation of his previous out-of-court identifications. We reject appellants' attempt to extend *L.D.O.* to the facts of this case.

Detective Lee's testimony about Mr. Branch's out-of-court identifications was admissible because Mr. Branch was available for cross-examination at trial. *Harley v. United States*, 471 A.2d 1013, 1015 (D.C. 1984); *Morris v. United States, supra*, 398 A.2d at 337; *see Rice v. United States, supra* (although victim did not identify defendant at trial, police officer's testimony that victim identified defendant at the scene was admissible because victim was available for cross-examination). Indeed, Branch was cross-examined by both defense counsel, but neither one of them deigned to ask him anything about his viewing of the photographs. From their total avoidance of the subject, we can only conclude that they had no basis for challenging his out-of-court identifications. Neither appellant has presented this court with a valid legal basis for such a challenge. We therefore hold that the court committed no error in allowing the jury to hear Detective Lee's testimony about Mr. Branch's identification of both appellants.

IV

Finally, appellant Driver maintains that the trial court committed plain error in not

excluding, *sua sponte*, all evidence of Mr. Hamlet's identification of him. He argues that the court should have reopened the suppression hearing when it learned, for the first time at trial, that an allegedly suggestive procedure was employed by the police in order to elicit an identification from Mr. Hamlet; and that, upon reconsidering the issue, the court should have found the identification procedures impermissibly suggestive and the identification itself unreliable.

At the pre-trial suppression hearing, Detective Lee testified that he showed Mr. Hamlet an array of nine black and white photographs, from which Hamlet selected a photo of Driver. Some time later Hamlet was shown ten color slides, and again he picked out a picture of Driver and said it "looked like" the man who had run out of the alley and past his house. Finally, Mr. Hamlet attended a lineup at police headquarters, and, although at first he said he was "not sure," he identified Driver almost immediately thereafter. Driver's counsel did not contend that the identification procedures were in any way suggestive, and the court found that they were not.

Driver now contends that there was evidence at trial which showed for the first time that the identification procedures employed by the police were suggestive. He further contends that this was not known and thus could not be asserted at the suppression hearing because the government withheld evidence at that hearing. In particular, Detective Lee testified on cross-examination at trial that when Mr. Hamlet was first shown the black and white array, he separated two photographs from the others—one of Driver and one of Kevin Saunders, a non-suspect—and said "it could be one or the other." Hamlet then told Lee that color photographs would help him in making a more certain identification. The color slides later shown to Hamlet included one of Driver, but not one of Saunders because the police did not have a slide of Saunders. The trial court immediately called a bench conference and expressed concern that Lee's trial testimony about the photographic array contradicted his earlier testimony. The prosecutor also expressed surprise, but counsel for Driver said nothing at all. After the bench conference ended, the prosecutor elicited from Detective Lee that the reason he did not mention the Saunders photo at the suppression hearing was that Hamlet was more certain in his selection of Driver, that "[h]e kept holding the photograph of Mr. Driver in his hand, saying that this looks like the one that tried to run through my yard." Lee's testimony continued:

Q. And where was the photograph of Mr. Saunders?

A. It was on top of the stack.

Q. And when he said this looks like the one who ran through my yard, what was he indicating to you? Which photograph?

A. Mr. Driver.

■ Despite his trial counsel's failure to object,[12] Driver now argues that the court should have reopened the suppression hearing *sua sponte* because Saunders was not included in either the showing of color slides or the lineup, both of which occurred after the viewing of the black and white array in which the photograph of Saunders was, if not selected, at least given serious consideration. He asserts that the repeated showing of a single suspect to a witness is an inherently suggestive procedure, citing *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), and that if sufficient indicia of reliability do not exist, the suggestiveness of repetitive showings mandates suppression. *See Foster v. California*, 394 U.S. 440, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969). The absence of Saunders from the group of color slides and from the lineup, Driver maintains, raises serious questions about the reliability of Mr. Hamlet's identification

---

**12.** Driver is represented by different counsel on appeal.

of him and renders the police procedures inherently suggestive.[13] We do not agree.

In determining the admissibility of evidence of an out-of-court identification, the governing standard is whether the procedure utilized was "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States, supra,* 390 U.S. at 384, 88 S.Ct. at 971. We held in *Patterson v. United States,* 384 A.2d 663, 665 (D.C.1978), that a challenge to an identification triggers a two-stage inquiry. First, the court must decide whether the identification was suggestive; if so, it must then determine whether the identification was nevertheless reliable, given the totality of the circumstances. *See Manson v. Brathwaite,* 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977) ("reliability is the linchpin in determining the admissibility of identification testimony"); *Neil v. Biggers,* 409 U.S. 188, 198–200, 93 S.Ct. 375, 381–382, 34 L.Ed.2d 401 (1972). At the suppression hearing in this case, the court concluded that the identification procedures were not suggestive, and counsel for Driver did not challenge that finding. Nothing occurred during the trial to change that result. The only circumstance that Driver now cites in support of his claim of suggestivity is that a photograph of Saunders was not included in the array of color slides. But the absence of Saunders' photograph from the group of slides is relevant on the issue of suggestivity only if we accept Driver's assertion that Hamlet identified two photographs from the first array.

A careful reading of the record shows that Saunders' photo was never actually identified, but merely set aside: Mr. Hamlet placed it on top of the stack of photographs while holding Driver's photograph out of the stack. Both Hamlet and Lee testified that Driver's photo was the one selected from that initial array, and that the group of color slides was put together only because Hamlet's identification was a bit tentative. No one testified that Mr. Hamlet selected Saunders' photo from the first array or that he identified Saunders in any way as a person he saw on August 27 near his home. Hamlet said he picked one photograph, that of Driver, and Lee testified that Hamlet looked at both Driver's and Saunders' photographs before selecting Driver's.[14] Furthermore, Lee stated that Saunders was not included in the group of slides because a color slide of Saunders was not available.

■ Neither the trial court nor Driver's counsel believed that the absence of a color photograph of Saunders made the showing of the slides improper. Absent a timely objection at trial, we will not overturn a trial court decision to admit identification testimony "unless it is found that the error served 'to jeopardize the very fairness and integrity of the trial.'" *Sheffield v. United States,* 397 A.2d 963, 967 (D.C.1979), quoting from *Watts v. United States,* 362 A.2d 706, 709 (D.C.1976) (en banc). In other words, Driver must now

---

**13.** Driver states in his brief:
  The suggestiveness lay in the repeated showing of only appellant to Hamlet after Hamlet indicated that he could not determine if appellant, or another man, was the person whom he had observed near the scene of the crime.... Rather than being required by exigent circumstances, the repetitive showing of appellant to Hamlet must be seen as a deliberate attempt to focus Hamlet's attention on appellant, and to divert it from Saunders, who was not a suspect.

**14.** Detective Lee testified on cross-examination:
  Q. [by Driver's counsel]: Detective Lee, isn't it true that when you spoke with Mr.

Hamlet on the 28th of August, 1982, a day after the robbery, he identified two persons who appeared to resemble one of the men who was in the robbery? He identified a photograph of Mr. Driver and also one of Kevin Saunders?
  A. He identified Mr. Driver. He looked at Mr. Saunders' photograph, but he stated that Mr. Driver was the one that he believed was trying to run through his yard.
  Q. Well—and, he didn't say that of Mr. Saunders?
  A. No, not about trying to run through his yard, no.

convince us that the trial court committed plain error affecting his substantial rights. He has conspicuously failed to do so. Driver has not demonstrated that the fairness of his trial was jeopardized either by Hamlet's in-court identification or by Lee's testimony. It was within the jury's province to weigh Hamlet's identification testimony as a whole and evaluate his credibility, as well as that of Detective Lee. Because Hamlet had a sufficient opportunity to observe Driver as he ran from the wrecked car in the alley to within fifteen feet of him, we simply cannot say that his identifications were unreliable as a matter of law.

We therefore hold that the trial court committed no error, and certainly no plain error, in admitting evidence of Mr. Hamlet's out-of-court identification of appellant Driver. Nor did the court err in failing to reopen the suppression hearing *sua sponte* in the middle of trial.

The convictions of both appellants are accordingly

*Affirmed.*