**Larry DANCY, Michael E. Mason, Jr., and Clayvon D. Anderson, Appellants,**

v.

**UNITED STATES, Appellee.**

**Nos. 97–CF–793, 97–CF–925 and 97–CF–800.**

District of Columbia Court of Appeals.

Argued Nov. 18, 1999.
Decided Jan. 27, 2000.

G. Godwin Oyewole, Washington, DC, appointed by the court, for appellant Dancy.

Francis T. Lacey, Rockville, MD, appointed by the court, for appellant Mason.

Kenneth E. Sealls, Washington, DC, appointed by the court, for appellant Anderson.

Alyse Graham, Assistant United States Attorney, with whom Wilma A. Lewis, United States Attorney, and John R. Fisher, Thomas J. Tourish, Jr., and Jennifer M. Anderson, Assistant United States Attorneys, were on the brief, for appellee.

Before FARRELL, GLICKMAN, and WASHINGTON, Associate Judges.

WASHINGTON, Associate Judge:

Appellants Larry Dancy, Michael Mason, and Clayvon Anderson were convicted by a jury of conspiracy to commit armed robbery,[1] first-degree burglary while armed,[2] two counts of armed robbery,[3] two counts of first-degree murder while armed (premeditated),[4] four counts of first-degree murder while armed (felony murder),[5] and assault with intent to kill while armed.[6] Mason and Anderson were also convicted of possession of a firearm during a crime of violence or dangerous offense,[7] and carrying a pistol without a license.[8] Appellants filed timely appeals on various grounds. We affirm and remand solely for the purpose of allowing the trial court to vacate certain merging convictions and resentence accordingly.

## I.

This case arises from the murders of Michelle and Thirese Lewis during a robbery of their home. On the morning of November 1, 1995, Michael Lewis telephoned appellant Anderson to buy either a half or full kilogram of cocaine. Lewis kept the money for his drug purchases in a safe that was hidden in a cardboard box in his mother's second-floor bedroom. The safe contained cash, personal papers, drugs, and a man's gold and diamond ring. Anderson had been present on several occasions when Lewis had conducted drug transactions and was aware that Lewis retrieved large amounts of cash from the safe upstairs. Anderson informed Lewis that he could be at Lewis' mother's house on Fifth Street with a half to a full kilogram of cocaine within thirty minutes. Lewis told Anderson that thirty minutes

was inconvenient, but he would call Anderson at 12:30 p.m. to arrange a time for the buy.

On the same morning, appellant Mason visited his girlfriend, Dominique Williams. Mason asked Williams if he could use her telephone to call Anderson. After the telephone call, Mason asked Williams if she would drive him to pick up Anderson and to a drug deal with "Mike." Before leaving, Mason pulled out a silver revolver, checked the barrel to see if it was loaded, and put it in his inside coat pocket. As they were driving in Williams' car, a white Cadillac, they spotted appellant Dancy, otherwise known as "Boogie."[9] Mason got out of the car to speak with Dancy, the two men got back in the car, and they then picked up Anderson.

After picking up Anderson, Mason directed Williams to drive to a house at 1010 Fifth Street, Northeast. Mason told Anderson to call to see if "Mike" was home. After placing the call, Anderson reported that "Mike" was not home. Mason told Williams to circle the block so that he could look for "Mike's" truck. When they did not see the truck, Mason told Williams to turn into an alley. Before exiting the car, Mason asked Anderson if he was "strapped," and Anderson answered yes. At about this time, a neighbor saw a white Cadillac pull into an alley and stop. As she passed the car, she saw that four people were inside. She saw three of them get out of the car, leaving one behind in the driver's seat. The three approached the house at 1010 Fifth Street.

Inside the house were Lewis' sisters, Michelle and Thirese, their mother's boy-

---

1. D.C.Code §§ 22–105(a), –1801(a), –3202 (1996).

2. D.C.Code §§ 22–1801(a), –3202.

3. D.C.Code §§ 22–2901, –3202.

4. D.C.Code §§ 22–2401, –3202.

5. D.C.Code §§ 22–2401, –3202.

6. D.C.Code §§ 22–501, –3202.

7. D.C.Code § 22–3204(b).

8. D.C.Code § 22–3204(a).

9. Williams and Mason's cousin, Sharnita Green, identified a photograph of Dancy as the person they knew as "Boogie." They also later made in-court identifications of him.

friend, James Reed, and Ronnie Sloan, Thirese Lewis' common law husband. Reed, while using the bathroom in the basement of the house, heard a scream and feet pounding upstairs. He then heard what sounded like several gunshots. Sloan, who was sleeping on the second floor of the house, woke up to the sound of gunshots. As he went to his bedroom door, he saw one man running down the stairs calling out, "It's one in the closet." A second man then came out of Mrs. Lewis' bedroom, stood in front of Sloan, and pointed a large revolver at him. Sloan recognized the man as "Mike" from his old neighborhood. Mason then shot Sloan three times in the chest. The two Lewis sisters had each been shot twice in the head.

Williams saw Anderson and Dancy come running from the direction of the house towards the car. According to Williams, Anderson and Dancy looked excited and had smiles on their faces. Anderson was carrying a large cardboard box. Mason quickly walked down the alley about two minutes later. Once in the car, Mason pulled his gun out of his jeans and put it in his coat and told Williams to drive away. As Williams drove away, Anderson and Dancy were shaking and fumbling with a safe that they had removed from the cardboard box. Dancy said, "Man, there ain't nothing in here, sound like some papers; we did all that for nothing." Mason asked Anderson, "Man, why you ain't shoot?" Anderson responded, "I tried to shoot but my gun got stuck." Mason then asked Anderson, "Man why you call out my name?" and yelled at Anderson for having called out Mason's name inside the house. Anderson explained that there was someone in the closet and that he needed Mason's help in looking for the safe.

Williams drove the group back to the house of Nitiya Miller, Anderson's old girlfriend. As they went inside, one of them was carrying the safe, and Mason and Anderson were carrying their guns. Anderson and Dancy went to find tools with which to open the safe. Mason finally opened it unassisted and found that it contained money, drugs, papers, and some jewelry. The three men began to count the money and to divide the items up among themselves. They each took a share of the money and drugs, and Anderson and Dancy each took a ring.

Anderson asked Mason to take the safe and dump it somewhere as Mason, Dancy and Williams were leaving, but Mason refused. Anderson took the safe to the back yard, burned the remaining papers to ashes, and rinsed out the safe with a hose. Miller then asked Anderson, "what was going on, who did you [Anderson] get." Anderson responded that he had "robbed some niggers in Northeast."

Williams dropped Dancy off at his apartment complex and then returned to her apartment building with Mason. Mason pulled out his gun and said he "had some bodies on it" and that he "had to get rid of it." He went across the hall to his cousin Sharnita Green's apartment and returned a few minutes later. When he returned, Mason described for Williams in detail what had happened inside the Lewis house. Later that day, Green was fixing a couch in her apartment when a silver or gray revolver, which she recognized as Mason's, popped out of it.

## II. LARRY DANCY

Dancy argues on appeal that (1) the trial court committed reversible error when it denied his motion for severance; (2) the trial court erred in sentencing him for a total of two counts of premeditated murder, four counts of felony murder while armed, as well as the underlying felonies of armed robbery and burglary while armed; and (3) the trial court committed reversible error by denying his motion for judgment of acquittal.[10]

---

10. Dancy also argues that his rights under the Constitution were violated when he was de-

nied the right to cross-examine Dominique Williams as to how she learned that "Boo-

Dancy first argues that the trial court erred in denying his motion for severance. An order denying severance may be reversed only upon a clear showing of abuse of discretion. *See Winestock v. United States,* 429 A.2d 519, 526 (D.C. 1981). In order to establish that the trial court abused its discretion in denying a severance, "a defendant must show not merely prejudice, but manifest prejudice." *Elliott v. United States,* 633 A.2d 27, 34 (D.C.1993) (internal quotation and citation omitted). Dancy specifically contends that the trial court abused its discretion in failing to grant severance under Super. Ct. Crim. R. 14 because his defenses were irreconcilable with that of Anderson, and Anderson's counsel had assumed the posture of a "second prosecutor" by pointing a finger at Dancy as the second gunman during his closing argument.[11] There exists a strong presumption that two defendants charged with jointly committing a criminal offense will be tried together. *See Ingram v. United States,* 592 A.2d 992, 996 (D.C.), *cert. denied,* 502 U.S. 1017, 112 S.Ct. 667, 116 L.Ed.2d 757 (1991). In order for a defendant to be granted severance on the basis of conflicting defenses, he "must demonstrate 'a clear and substantial contradiction between the respective defenses,' causing inherent irreconcilability between them." *(Ronald) Garris v. United States,* 559 A.2d 323, 329 (D.C. 1989) (quoting *Tillman v. United States,* 519 A.2d 166, 169 (D.C.1986)).

According to Dancy, his defenses were irreconcilable with that of Anderson because each attorney argued that his client did not participate in the crimes.

The trial court, however, in denying Dancy's motion for severance, rejected the assertion that the defenses were irreconcilable. The trial court noted that Anderson's defense was merely that the government had not proven its case with respect to himself. Furthermore, neither Dancy nor Anderson called any witnesses on his own behalf. Any theory of the case with respect to Dancy or Anderson was only provided through closing arguments. Closing arguments by counsel are not evidence for severance purposes because the "level of the antagonism in defenses is measured by the evidence actually introduced at trial." *United States v. Rose,* 104 F.3d 1408, 1417 (1st Cir.), *cert. denied,* 520 U.S. 1258, 117 S.Ct. 2424, 138 L.Ed.2d 187 (1997).

The trial court further found that, even if Dancy's and Anderson's defenses were conflicting, Dancy was not prejudiced by the conflict. Unfair prejudice "does not arise merely because defendants are mutually hostile and attempt to blame each other." *Ingram,* 592 A.2d at 996. In order to show prejudice, Dancy must demonstrate that there is "a danger or risk that the jury will draw an improper conclusion from the existence of the conflicting defenses alone that both defendants are guilty." *Garris,* 559 A.2d at 329. The trial court specifically noted that there was enough independent evidence of Dancy's guilt so that it could reasonably find with substantial certainty that the conflict in defenses alone would not sway the jury to find Dancy guilty. The government's evidence against Dancy included that he willingly drove to and from the scene, re-

---

gie's" real name, the person she identified as participating in the crimes, was Dancy. However, Dancy's claim is without merit. The trial court did not prohibit Dancy from cross-examining Williams but merely advised Dancy that his proposed line of inquiry would draw a hearsay objection from Mason's counsel. The trial court left the decision as to how to proceed with the line of questioning to Dancy's discretion. After giving the trial court's advice consideration, Dancy continued with his cross-examination of Williams but

decided to forego questioning Williams as to how she had learned Dancy's name.

11. Super. Ct.Crim. R. 14 provides in part:

[i]f it appears that a defendant or the government is prejudiced by a joinder of ... defendants ... by such joinder for trial together, the Court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires.

turned grinning to the car with Anderson, attempted to pry open the safe, and received a split of the proceeds. Because there were no irreconcilable defenses and no prejudice to Dancy, the trial court did not abuse its discretion in denying his motion for severance.

■ Dancy also argues that the trial court erred in sentencing him for a total of two counts of premeditated murder, four counts of felony murder while armed, as well as the underlying felonies of armed robbery and burglary while armed. Dancy specifically argues that the case should be remanded for resentencing so that the trial court can elect which counts to merge. This court has held that a "defendant cannot remain convicted of premeditated murder and felony murder of the same decedent, nor of both felony murder and the underlying felony." *Green v. United States*, 718 A.2d 1042, 1062 (D.C.1998) (citing *Parker v. United States*, 692 A.2d 913, 918 n. 9 (D.C.1997)). Therefore, we must remand the case to permit the trial court to determine which counts should merge and to resentence accordingly in order to "allow[ ] the trial court to effectuate its original sentencing plan without violating the Double Jeopardy Clause." *(David) Garris v. United States*, 491 A.2d 511, 514 (D.C.1985).[12]

■ Dancy finally contends that the trial court committed reversible error by denying his motion for judgment of acquittal because there was insufficient evidence to prove that he aided and abetted in the shooting and the burglary. In reviewing a denial of a motion for judgment of acquittal, this court must "view the evidence in the light most favorable to the government, giving deference to the fact finder's

right to weigh the evidence, determine the credibility of the witnesses, and draw inferences from the evidence presented. We can only reverse a conviction on this ground if there is no evidence upon which a reasonable mind could infer guilt beyond a reasonable doubt." *Patton v. United States*, 633 A.2d 800, 820 (D.C.1993).

■ Dancy's claim that the trial court erred in denying his motion for judgment of acquittal has no merit. There was ample evidence of Dancy's participation in the crimes. According to Williams, the driver of the car, Dancy struggled to open the stolen safe in the car following the murders and stated, "Man, there ain't nothing in here, sounds like papers; we did all that for nothing." Furthermore, witnesses testified that Dancy ran to the car from the victims' house with Anderson, smiling as he arrived, continued trying to open the safe throughout the car ride, looked for tools to open the safe, helped count out the money, drugs, and other items in the safe, and ultimately took his own share, including a diamond ring which he was seen wearing shortly after the murders. Therefore, viewing the evidence in the light most favorable to the government, the trial court did not err in denying Dancy's motion for judgment of acquittal.

### III. MICHAEL E. MASON, JR.

■ Mason argues that the trial court erred (1) by denying his motion for severance; (2) in admitting an out-of-court identification of Mason; (3) in admitting a prior consistent statement by the government's chief witness; (4) in limiting his cross-examination of the government's firearm expert; and (5) in failing to *sua sponte* declare a mistrial due to prosecutorial misconduct.[13]

12. Mason and Anderson adopted Dancy's merger argument. Therefore, as to all three appellants, if the trial court determines that the premeditated murder convictions remain as the murder convictions, the felony murder convictions will be vacated, but the underlying felonies will stand. If, however, one of the felony murder convictions remains as the murder conviction, the underlying felony of

that murder will be vacated, but the other underlying felonies will stand. *See Green*, 718 A.2d at 1063 n. 28; *Bonhart v. United States*, 691 A.2d 160, 164 (D.C.1997).

13. Mason also claims that he was denied a fair trial due to the bias and partiality of the trial judge. Mason's contention, however, is without merit because he fails to demonstrate

Mason first argues that the trial court erred in denying his motion for severance. Mason specifically contends that his trial should be severed from his co-defendants because the admission of various co-defendant statements would unduly prejudice him. The denial of a severance motion "rests within the broad discretion of the trial court." *Jennings v. United States*, 431 A.2d 552, 556 (D.C.1981), *cert. denied*, 457 U.S. 1135, 102 S.Ct. 2964, 73 L.Ed.2d 1353 (1982). Therefore, this court will reverse only upon a showing of an abuse of that discretion. *See id.*

While it is true that, in a joint trial of co-defendants, certain precautions must be taken to avoid conflict with the Confrontation Clause of the Sixth Amendment, the Supreme Court has held that full redaction of a statement to eliminate any reference to a co-defendant, combined with a limiting instruction to the jury to consider the statement only against the declarant defendant, satisfies the requirement of the Confrontation Clause. *See Richardson v. Marsh*, 481 U.S. 200, 211, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987). In this case, the trial court admitted statements made by Anderson to his old girlfriend, Nitiya Miller, and to the police that "they had just robbed some niggers in Northeast." The

trial court ruled that Anderson's statements were admissible as to him if properly redacted to eliminate any references to co-defendants and accompanied by a limiting instruction. Therefore, Miller testified at trial that after she asked Anderson "who did he get," he replied, "I robbed some niggers in Northeast." The trial court also instructed the jury that this statement could be considered only in its evaluation of the case against Anderson and could not be attributed to the other defendants in this case with respect to its evaluation in the case against them. Because the statement contained no reference to anyone but Anderson and the trial court gave the jury a limiting instruction, the trial court did not abuse its discretion in denying Mason's motion for severance.[14]

Mason also contends that the trial court erred in admitting testimony regarding an out-of-court identification of himself. Mason argues that Michael Lewis' testimony regarding Ronnie Sloan's non-verbal identification of Mason as the shooter was inadmissible hearsay.[15] Mason moved in limine to exclude this portion of Lewis' testimony on the grounds that there was insufficient indicia of reliability. The trial court denied Mason's motion. Therefore,

how the trial judge's actions precluded him from having a fair trial. Indeed, "[a]dverse rulings, without more, certainly do not establish that a judge lacked the impartiality necessary to give the accused a fair trial." *Gregory v. United States*, 393 A.2d 132, 143 (D.C. 1978); *see Stansel v. American Security Bank*, 547 A.2d 990, 994 (D.C.1988).

14. Anderson also argues that the trial court erred in denying his motion for severance. The trial court ruled that a statement made by Mason to Dominique Williams in which he described what had happened inside the victims' house was admissible as to Mason if properly redacted to eliminate any references to co-defendants and accompanied by a limiting instruction. Therefore, Williams testified at trial that when she and Mason returned to her apartment after the shootings, Mason told her that "[h]e knocked on the door .... He barged his way in .... He hit [one of the victims] with the gun .... [He] shot her in the head, and the other girl started screaming.

And he did the same to her." The trial court also instructed the jury that this statement could be considered only in its evaluation of the case against Mason and could not be attributed to the other defendants in this case with respect to its evaluation in the case against them. Thus, for the reasons already discussed under Mason, the trial court properly denied Anderson's motion for severance.

15. The non-verbal identification referred to concerns a hospital visit between Lewis and Sloan, the day after Sloan underwent surgery for the gunshot wounds he suffered from the incident in question. Because Sloan's lips were swollen, he could not speak but seemed able to understand conversation. In response to questions, Sloan squeezed Lewis' hand, indicating that "Mike" from "Second and T," Sloan's old neighborhood, was the person who had shot him. This non-verbal procedure was described by both Lewis and Sloan at trial.

we must review such an evidentiary ruling for abuse of discretion. *See (William T.) Johnson v. United States*, 452 A.2d 959, 960 (D.C.1982).

▮▮▮▮ Pre-trial out-of-court identifications are admissible at trial when the identifier is available for cross-examination. *See Paris v. United States*, 515 A.2d 199, 205 (D.C.1986); *Harley v. United States*, 471 A.2d 1013, 1015 (D.C.1984); *Rice v. United States*, 437 A.2d 582, 583 (D.C.1981); *Morris v. United States*, 398 A.2d 333, 336–38 (D.C.1978). Such identification evidence is admissible through the testimony of either the identifier or witnesses present at the prior identification. *See Paris*, 515 A.2d at 205; *Rice*, 437 A.2d at 583. Because Sloan was not only available for cross-examination at trial, but was in fact cross-examined on this issue of his non-verbal identification of Mason, Lewis' testimony was not hearsay and was properly admitted.

▮▮▮ Mason also argues that the trial court erred in admitting a prior consistent statement made by Dominique Williams and elicited during the testimony of LaTonya Abrom. The trial court has "broad discretion with respect to the admission or exclusion of prior consistent statements." *Prophet v. United States*, 602 A.2d 1087, 1094 (D.C.1992) (internal quotations and citation omitted). Therefore, we may find error only where the trial court abused that discretion. *See id.*

▮▮▮▮ This court has held that "[a]s a general rule, prior statements consistent with a witness' trial testimony are inadmissible on the theory that mere repetition does not imply veracity." *Reed v. United States*, 452 A.2d 1173, 1180 (D.C.1982), *cert. denied*, 464 U.S. 839, 104 S.Ct. 132, 78 L.Ed.2d 127 (1983) (internal quotations omitted). However, we have recognized an exception where there is a "suggestion of fabrication or of a motive to lie at trial."

*Prophet*, 602 A.2d at 1093; *see Yelverton v. United States*, 606 A.2d 181, 184 (D.C. 1992). Therefore, a party may introduce a witness' prior consistent statement to rebut such a suggestion if the prior statement was made "at a time when the witness did not have a motive to fabricate." *Reed*, 452 A.2d at 1180. In this case, during Mason's cross-examination of Dominique Williams, Williams testified that Mason had been abusive to her and that, at some undetermined time, she had told him she was going to "get him" for beating her. Through this testimony, Mason attempted to demonstrate that Williams had fabricated her story to the police in order to get back at him, falsely implicating him in the killings. The government later alerted the court that it intended to elicit from LaTonya Abrom a prior consistent statement made to her by Williams. The statement made by Williams was a description of the events surrounding the murders.[16] Abrom testified that Williams had made the statement to her shortly after the shootings and before Williams had given her statement to the police. The trial court therefore found that the statement was used to rebut a charge of recent fabrication and that there was no basis on which it could conclude that Williams' statement was made at a time when she had a motive to fabricate. We disagree. Because it was never made clear when, according to Williams, Mason had beaten her and she accordingly had threatened to "get him," and Abrom did not testify as to exactly when Williams made the consistent statement to her, the trial court could not properly find that the alleged influence or motive to fabricate, Mason's physical abuse of Williams, postdated her statement to Abrom. Under such circumstances, the trial court erred in admitting Williams' statement to Abrom.

▮▮▮ The admission of Williams' statement to Abrom, however, was harmless

16. Williams' statement to Abrom was that she drove Mason, "Clayvon," and another friend to the scene of a planned drug transaction, that she waited in the car, and that Mason had admitted to killing three people in the house.

error. As this court has previously noted, "'the objection to the introduction of prior consistent statements is at bottom based on the principle of irrelevance ... [t]herefore, the harm that may occur even if the jury should draw such an inference is less serious than the inadmissible introduction of clearly prejudicial evidence.'" *McKenzie v. United States*, 659 A.2d 838, 841 n. 9 (D.C.1995) (quoting *Jordan v. United States*, 633 A.2d 373, 377 (D.C.1993)). Here, Sloan, the surviving victim, identified Mason as the one who shot him. Miller, Anderson's old girlfriend, also identified Mason as one of the people who came to her house with Anderson at the time that they opened the safe, counted the money, and divided up the property. We therefore conclude that the strength of the evidence against Mason offset any prejudice from the admission of Williams' statement.[17]

■ Mason also contends that the trial court erred in limiting his cross-examination of the government's firearm expert. Mason specifically argues that he was precluded from pursuing his "theory of the case" when the trial court sustained objections to certain questions he posed to the firearm expert. The evidence showed that at least four bullets were fired into the two Lewis girls, and another three or four bullets were fired into Sloan. During the examination of the firearm expert, Mason attempted to demonstrate that he was not the sole shooter by trying to elicit testimony that seven and eight-shot revolvers are rare. However, this evidence would not have demonstrated that Mason could not have fired all of the shots. The evidence showed that Mason would have had time to reload his weapon. Because Mason has failed to demonstrate any reasonable possibility that the evidence he sought to elicit from the firearms expert would have altered the outcome of the trial, we find no reversible error.

■ Mason finally argues that the trial court erred in failing to *sua sponte* declare a mistrial due to an improper statement made by the prosecutor during her closing argument. Specifically, the prosecutor stated that "[i]t's kind of ironic that our system allows ... Mason, ... Anderson, and ... Dancy to have a jury and a judge and have argument and everything else. That's precisely what they denied those three people." The decision to grant a mistrial is subject to the broad discretion of the trial court and our standard of review is deferential. *Wright v. United States*, 637 A.2d 95, 100 (D.C.1994). This court is only inclined to reverse "[i]n extreme situations threatening a miscarriage of justice." *Id.* (citing *Goins v. United States*, 617 A.2d 956, 958 (D.C.1992)).

■ When analyzing claims of prosecutorial misconduct, it is first necessary to "determine whether the prosecutor's actions were improper." *Diaz v. United States*, 716 A.2d 173, 179 (D.C.1998) (citation omitted). Assuming the prosecutor's statements were improper here based on the fact that the trial court sustained Mason's objection to the statements, we must nevertheless determine if the comments constitute substantial prejudice that warrants reversal. *Id.* at 181. This court weighs four specific factors when considering the impact of a prosecutor's misconduct: 1) the gravity of the misconduct, 2) the direct relationship to the issue of guilt, 3) the effect of corrective instructions by the trial court, and 4) the strength of the government's case. *Id.* (citing *Hammill v. United States*, 498 A.2d 551, 554 (D.C.

---

**17.** Anderson also raises the same issue as Mason as to the admissibility of Williams' prior consistent statement. For the reasons already stated, the admission of the statement was harmless error. As with Mason, Miller testified that she had seen Anderson with a gun in his waistband on the morning of the shootings, he later returned to her house with three others, carrying guns and a safe, and they subsequently divided up a large sum of cash and other items. Miller further testified that Anderson took the safe to the backyard, burned the remaining papers inside the safe, and admitted to her that he had "robbed some niggers in Northeast."

1985) (citations omitted in original)). Based on these four factors, we cannot conclude that Mason suffered substantial prejudice. First, the prosecutor's error was not so egregious as to influence the jury to take a specific course of action. There was ample independent evidence against Mason for a jury to find him guilty. Second, the comment bore only a tenuous relationship to the issue of guilt. There was enough evidence presented at trial that such a comment did not distort the specific proof in the case. Third, there was no request for a curative instruction. Finally, as stated before, the evidence presented at trial was strong enough that such a statement could not have substantially affected the jury's decision. Therefore, although the prosecutor's statement was irrelevant and better left unsaid, we cannot conclude that it was so prejudicial as to warrant a new trial. *See Lee v. United States*, 668 A.2d 822, 831 (D.C. 1995).[18]

## IV. CLAYVON D. ANDERSON

Anderson argues that the trial court erred in (1) denying his motion for a mistrial: (2) allowing a witness to testify to a redacted version of a statement that he made to her; and (3) declining to suppress statements he made to a detective before he was read his *Miranda*[19] rights.

Anderson first argues that the trial court erred in denying his motion for a mistrial. He specifically contends that he was prejudiced when he was seen by at least three jurors being escorted back to the cellblock behind the courtroom. Anderson also claims that he should have been granted a mistrial because Michael Lewis had been improperly allowed to testify as to his prior drug dealings with Anderson. As stated before, the decision to grant a mistrial is subject to the broad discretion of the trial court, and our standard of review is deferential. *See Wright*, 637 A.2d at 100.

■■■ Anderson's first claim that he should be granted a mistrial on the "basis that the observed act of a defendant being led to a cellblock during trial probably causes a layperson to ignore the presumption of innocence," must fail because this court has previously stated that such an incident would not necessarily cause prejudice, and the appellant failed to demonstrate any prejudice. *Watts v. United States*, 449 A.2d 308 (D.C.1982). As this court noted, "even the most unsophisticated juror must know that defendants indicted for serious crimes ... may have to post bail ... [and] that many defendants lack the resources to accomplish this." *Id.* at 312. Here, the trial court agreed to admonish the Marshals and there were no further complaints from counsel. Because Anderson failed to show that he was prejudiced, the trial court's ruling was proper. *Id.* at 311–12.

■■■ Anderson's second claim that he was entitled to a mistrial on the basis of Michael Lewis' reference to prior drug dealings with him must similarly fail. Lewis' testimony was admissible to show Anderson's motive for committing the crimes, his intent in entering the house, and his knowledge of where to find the hidden safe. *See (William A.) Johnson v. United States*, 683 A.2d 1087 (D.C.1996) (en banc), *cert. denied*, 520 U.S. 1148, 117 S.Ct. 1323, 137 L.Ed.2d 484 (1997). "[I]n cases where evidence of incidental, uncharged criminal conduct is inextricably intertwined with evidence of the charged offense, evidence of the uncharged criminal conduct is directly admissible without the necessity of a cautionary *Drew* instruction." *Toliver v. United States*, 468 A.2d 958, 961 (D.C.1983). The statement's prej-

---

**18.** Anderson joins Mason in his argument that the trial court erred in not declaring a mistrial due to prosecutorial misconduct. However, his claim fails for the reasons already stated.

**19.** *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

udicial effect did not substantially outweigh its probative value, and the trial court did not abuse its discretion in denying Anderson's motion for a mistrial.

Anderson also argues that the trial court erred in allowing Miller, Anderson's old girlfriend, to testify to a redacted version of a statement that he had made to her. Miller's statement that Anderson told her "they had just robbed some niggers in Northeast" was redacted at trial to state, "I robbed some niggers in Northeast," in order to eliminate reference to his co-defendants. Anderson claims that the redacted statement changes the original statement into an admission on his part. The trial court has "broad discretion to determine the substance, form, and quantum of evidence which is to be presented to a jury." *(William T.) Johnson,* 452 A.2d at 960. This court's scope of review "is limited to whether the trial court has abused its discretion." *Id.*

Anderson claims that when he used the word "they" in the statement, he was referring to another group besides Anderson and his co-defendants and that the statement in its original form served to exculpate him. However, the statement, when viewed in the context of Miller's testimony, expressly includes Anderson in the meaning of "they." Before the redaction, Miller's original testimony was, "I asked Clay what did he do, you know, what was going on, and he told me that they had just robbed some niggers in Northeast, period." Furthermore, according to Miller's testimony, she had seen Anderson with a gun in his waistband on the morning of the shootings, he later returned to her house with three others, carrying guns and a safe, and they subsequently divided up a large sum of cash and other items. Therefore, the trial court appropriately admitted a redacted form of the statement in order to inculpate only Anderson and not his co-defendants.

Anderson finally contends that the trial court erred in denying his motion to suppress statements he made to Detective Bell before he was read his *Miranda* rights. When reviewing a trial court's denial of a motion to suppress, this court's scope of review is limited. *See Womack v. United States,* 673 A.2d 603, 607 (D.C. 1996), *cert. denied,* 519 U.S. 1156, 117 S.Ct. 1097, 137 L.Ed.2d 229 (1997). We must "defer to the trial judge's findings of evidentiary fact." *Id.* Furthermore, the evidence presented at the suppression hearing must be viewed "in the light most favorable to the party prevailing below," and we must draw "all reasonable inferences in that party's favor." *Id.*

Under *Miranda,* a person's rights are not triggered until he or she is in police custody and subject to interrogation. *Miranda, supra* note 19, 384 U.S. at 461, 86 S.Ct. 1602. There was no dispute that Anderson was in custody and that he was given his *Miranda* rights only until after the statements in question were obtained. The only question was whether Anderson was subject to interrogation. Interrogation has been defined by the Supreme Court to include not only express questioning, but also "its functional equivalent." *Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). In other words, interrogation refers to "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response." *Id.* The test for whether a suspect has been subject to interrogation or its functional equivalent focuses on "the perceptions of the suspect, rather than the intent of the police." *Id.* at 301, 100 S.Ct. 1682. However, the Court noted that "where a police practice is designed to elicit an incriminating response from the accused, it is unlikely that the practice will not also be one which the police should have known was reasonably likely to have that effect." *Id.* at 301–02 n. 7, 100 S.Ct. 1682.

In this case, Anderson was in the hospital receiving treatment for gunshot wounds in an unrelated case. Detective

Bell went to the hospital for the purpose of advising Anderson that he was under arrest and to interview him about the Lewis killings. Detective Bell was the only person in the room with Anderson. After informing Anderson that he had an arrest warrant for him, Detective Bell told him about the investigation into the Lewis murders, including Anderson's apparent involvement in the crime and the penalty if convicted. Anderson subsequently blurted out, "I heard that girl's not getting charged with nothing. That girl, is she being charged too? What about Mike? Is he finished?" At that moment, hospital staff came to move Anderson to another room. Detective Bell followed Anderson to the new room and subsequently asked him if he would be willing to tell Detective Bell about his involvement. Anderson then stated that he wanted to speak to his lawyer, upon which Detective Bell read Anderson his *Miranda* rights.

 A review of the circumstances which led to Anderson's statements compel the conclusion that the statements were obtained in a manner that was the functional equivalent of "custodial interrogation." Objectively viewing Detective Bell's remarks and actions, we conclude that he should have known they were reasonably likely to elicit incriminating evidence. There were no "extenuating circumstances to suggest that [Detective Bell] had any purpose in inducing [Anderson] to talk other than to pursue his investigation . . . ." *Derrington v. United States*, 488 A.2d, 1314, 1328 (D.C.1985). Furthermore, Detective Bell admitted that he made his statements to Anderson with the hope that by Anderson knowing what Detective Bell knew, he would be willing to want to talk about his involvement.[20] Therefore, we find that Anderson's *Miranda* rights were violated and the court erroneously denied Anderson's motion to suppress.

 Even though we find that the trial court should have granted Anderson's motion to suppress, we conclude that any error in the admission of his statements was harmless. In determining whether the admission of a statement obtained in violation of *Miranda* is harmless, we examine "whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction." *Chapman v. California*, 386 U.S. 18, 23, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) (quoting *Fahy v. Connecticut*, 375 U.S. 85, 86–87, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963)). Here, Anderson's statements to Detective Bell do not expressly implicate himself in the crimes. Therefore, Anderson's statements were not directly incriminating. Furthermore, there was compelling evidence of Anderson's involvement in the crimes apart from his statement to Detective Bell. Besides Williams' testimony de-

---

**20.** This court has relied on a police officer's subjective intent as supporting a conclusion of interrogation. *See Morris v. United States*, 728 A.2d 1210, 1217 (D.C.1999) (detective acknowledged "he had decided to accuse Morris of sexually molesting [the victim] in order to see 'what kind of reaction I [would] get' "); *Derrington*, 488 A.2d at 1329 (detective's remarks "were designed to elicit an incriminating response" where they "were intended 'to let [defendant] know that we knew he was the trigger man . . . and I would like very much for him to tell me if he so desired' "); *Wilson v. United States*, 444 A.2d 25, 27–28 (D.C.1982) (detective "admitted that his and [a second detective's] intent in engaging the [defendant] in conversation" that a witness had implicated him, "was to induce his statement"); *United States v. Alexander*, 428 A.2d 42, 45 & n. 9 (D.C.1981) (detective admitted his statement to accused that " 'we know what happened' or 'we know you are responsible for the stabbing' " was "an interrogation technique designed to get her to talk").

We further note that unlike our recent decision in *United States v. Brown*, 737 A.2d 1016 (D.C.1999), where we found no interrogation under *Innis, supra*, because the aggregate circumstances did not rise above the "subtle compulsion" inherent in any arrest, *id.* at 1020, here Detective Bell's actions in telling Anderson, who was alone in the hospital room, both of the police's knowledge of his involvement in the crime and of the penalty he faced for it were such that the detective reasonably should have anticipated responsive statements.

scribing in detail Anderson's role in staging the robbery and carrying away the proceeds, Miller confirmed his actions in dividing up the proceeds and testified that he admitted the robbery to her. The fact that the prosecutor did not mention Anderson's statements in her opening, closing, or rebuttal statements to the jury further demonstrates their insignificance to the evidence of Anderson's guilt. For these reasons, the admission of Anderson's statements to Detective Bell was harmless error. *See Derrington,* 488 A.2d at 1333.

For the foregoing reasons, we affirm the judgment of the trial court but remand for resentencing not inconsistent with this opinion.

*So ordered.*