Curtis A. SMITH, Appellant,

v.

UNITED STATES, Appellee.

No. 97–CF–812.

District of Columbia Court of Appeals.

Argued Jan. 2, 2001.
Decided Aug. 2, 2001.

Gregory A. Cotter, Washington, DC, appointed by the court, for appellant.

Thomas J. Tourish, Jr., Assistant United States Attorney, with whom Wilma A. Lewis, United States Attorney at the time the brief was filed, John R. Fisher, Ann K. H. Simon, Mary-Patrice Brown, Robert C. Little, Yvonne O. Lee, and Ryan H. Rainey, Assistant United States Attorneys, were on the brief, for appellee.

Before TERRY and FARRELL, Associate Judges, and GALLAGHER, Senior Judge.

GALLAGHER, Senior Judge:

On January 9, 1997, after a jury trial, appellant Curtis A. Smith was convicted of armed robbery in violation of D.C.Code §§ 22–2901 and –3202 (1996). Smith raises three issues on appeal. First, he argues that the trial judge erroneously denied his motion to suppress the identifications of two eyewitnesses. Second, he asserts that the trial judge improperly permitted the government to introduce evidence of his pre-trial flight. Finally, he posits that the government failed to present evidence sufficient to establish that he was armed and, therefore, that the trial judge incorrectly denied his motion for judgment of acquittal on the armed robbery charge. We disagree with Smith's arguments and affirm.

I.

At approximately 11:00 p.m. on April 19, 1996, Officer Tim Harris and another member of the Metropolitan Police Department ("MPD") were outside a Checkers drive-in restaurant in the District of Columbia. Officer Harris recognized Smith as he walked by and asked him if his name was Curtis Snowden. Officer Harris thought he knew Smith from McFarland Junior High School. Smith responded by saying that his first name was Curtis, but that his last name was not Snowden. Smith then asked Officer Harris if he knew his cousin, Nigel Brown, who was also an MPD officer.

During their conversation, appellant Smith was wearing a red jacket, a gray sweat shirt, gray sweat pants, and had a "dark, puffy" eye and a mustache. Following their conversation, Smith walked across the street to a pay phone only to return to the area around the restaurant a short time later. He then went into the restaurant, stood around for a few minutes, ordered a beverage, and left. Soon thereafter, he approached the "low-side" drive-up window from the outside, pushed Diane Williams, the Checkers employee servicing the drive-up window, and "started going through the [cash] drawer." With his right hand in his jacket pocket, Smith used his left hand to pilfer the cash register. During the robbery, Smith's right hand and, thus, right jacket pocket were pointed through the window in the

direction of Williams and Brenda Kearney, another Checkers employee. Both Williams and Kearney testified that they believed Smith had a gun inside his right jacket pocket. No one, however, saw Smith holding a gun, nor did anyone actually observe a gun on Smith's person. A gun was never recovered. At some point, Johnnie Washington, a manager at the restaurant, approached Smith from the inside of the restaurant. Upon seeing Washington, Williams testified that Smith "told [the manager] to the stay the * * * * back before he shoot him." Kearney testified that Smith's exact words were, "Move—move back or I'll shoot." Calls for help ensued and Smith quickly fled the scene.

Upon hearing the pleas for assistance, Officer Harris, who was still in the vicinity, pursued Smith by following the directions of those who had witnessed Smith's flight. However, he was unable to locate Smith and returned to the restaurant a short time later. Kearney then told Officer Harris that the perpetrator was "[t]he guy with the red jacket that was talking to you outside in the picnic area."[1] In addition to observing him during the robbery, both Williams and Kearney had seen Smith inside, or just outside, the restaurant prior to the commission of the crime. In fact,

Kearney had served him a beverage just prior to the robbery.

Kearney and Williams provided similar descriptions of the offender to the investigating detective, MPD Detective Larry West. Kearney told Detective West that the perpetrator was wearing a red jacket, had a "black eye," was approximately thirty-five years old and five feet eight inches tall, and had a complexion similar to Kearney's.[2] Williams described the robber as a "brown-skinned" black male, in his thirties and six feet tall, with a "black puffy eye" who was wearing a red sweat shirt with pockets.[3]

On August 27, 1996, MPD Detective Diana Pristoop showed Officer Harris a photo array which contained nine photographs. Officer Harris selected Smith's photograph. With Officer Harris' identification, Detective Pristoop was able to secure an arrest warrant.

She also proceeded to conduct identification procedures with Washington, Kearney, and Williams. On November 1, 1996, Detective Pristoop showed Washington two group photographs of a September 25, 1996 line-up.[4] Washington ultimately identified a police "filler," and not Smith, as the perpetrator of the crime.

1. Despite the fact that the robbery occurred at night, Kearney testified that the lighting outside was "very good" at the pre-trial hearing on the motion to suppress the identifications of Williams and Kearney.

2. During the suppression hearing, Kearney testified that she described the perpetrator to Detective West in the following manner: "[H]e was wearing a red jacket ... [h]e was my complexion and he had a black eye." Our review of the record does not reveal any specifics about Kearney's complexion. Presumably, however, the trial judge and the jury could have made a comparison.

3. During the suppression hearing, Williams testified that she described the perpetrator to

Detective West in the following manner: "Brown-skinned, medium built and looked like he could be 30, in his mid 30s.... And had a left black eye. He could have been six feet or a little taller.... He had on a red sweat shirt and just a black hat hanging out of his pocket."

4. Apparently none of the witnesses was able to attend the September 25, 1996 line-up. During the pre-trial hearing on the motion to suppress, Detective Pristoop testified that she told the line-up unit to pick subjects for the line-up who were "black male[s], medium to light complected, [and] six foot."

Feeling that the depictions of the men in the two group photographs were not optimum for identification purposes, Detective Pristoop enlarged the group photographs and separated them by individual. On November 6, 1996, Kearney and Williams were exposed to this "new" photo array. The array consisted of fourteen total pictures, two each of the seven subjects who made up the September 25, 1996, group line-up. Both Kearney and Williams were shown the photo array separately.[5] Without hesitation, Kearney selected Smith's photograph, signing "That's him" on the back of the photograph. Williams also picked Smith's picture, noting "This looks exactly like him. Positive that's him!" on the back of the same photograph.

Following Smith's arrest, on September 17, 1996, Deputy United States Marshal Christopher Layer brought Smith to a preliminary hearing for the charges stemming from the robbery. According to Deputy Layer, when the trial court ruled that Smith was to be held without bond pending trial, Smith attempted to flee the courtroom. A plainclothes MPD officer apprehended Smith before he could escape.

Sandra Dockery, Smith's mother, testified at trial that her son briefly attended McFarland Junior High School and that Officer Nigel Brown is her son's cousin.

Prior to the trial, the court conducted an evidentiary hearing on Smith's motion to suppress the photographic identifications of Kearney and Williams. After hearing testimony from Detective Pristoop, Detective West, Williams, and Kearney,[6] as well as arguments from both parties, the trial judge denied the motion on January 6, 1997. Defense counsel also sought to exclude the introduction at trial of any evidence concerning Smith's flight following the preliminary hearing. On January 8, 1997, the trial judge, after hearing arguments, denied defense counsel's request and ruled that the government could present such evidence. On January 9, 1997, a jury convicted Smith of armed robbery.

## II.

Smith first argues that the trial court erred in denying his motion to suppress the identifications of Williams and Kearney because the photo array shown to them was unnecessarily suggestive and conducive to irreparable misidentification. We focus on two questions when reviewing an identification procedure:

(1) Was the identification procedure "unnecessarily suggestive and conducive to irreparable misidentification"?

(2) If so, given the "totality of circumstances," was the resulting identification reliable nonetheless?

*Buergas v. United States,* 686 A.2d 556, 558 (D.C.1996) (quoting *Henderson v. United States,* 527 A.2d 1262, 1268 (D.C. 1987)). In determining the answer to the first question, "we examine whether some related circumstances or something 'in the

---

**5.** Both Williams and Kearney testified during the pre-trial motion to suppress, as well as during trial, that Detective Pristoop did not suggest which photograph to select, nor did she communicate that the picture of the perpetrator was even in the photo array.

**6.** The evidence presented during the hearing mimicked the evidence adduced at trial (and recited herein) pertaining to the identification of Smith by Kearney and Williams. Detective

Pristoop testified about the identification procedures used for Williams and Kearney. Detective West testified about the descriptions of the perpetrator given to him by Williams and Kearney. Both Williams and Kearney testified about the robbery itself, their communications with Officer Harris, Detective West, and Detective Pristoop, and their identification of Smith from the photo array on November 6, 1996.

[photo] array would have directed [the] witness' attention to any particular individual.'" *Id.* (quoting *McClain v. United States,* 460 A.2d 562, 566 (D.C.1983) (alteration in original)). "[U]nless a physical feature is deemed an important or crucial identifying feature, the presence or absence of such a trait does not necessarily render an array unduly suggestive." *Id.* at 559. Moreover, "[w]e are bound by the trial court's findings if they are supported by the evidence and in accordance with law." *Stewart v. United States,* 490 A.2d 619, 623 (D.C.1985); *see also United States v. Walton,* 411 A.2d 333, 339 (D.C.1979) (citing D.C.Code § 17–305(a) (1973)).

■ Smith argues that the array was unnecessarily suggestive because it contained photographs of only one other lightly complected African–American male. The other similarly complected individual, according to Smith, was not even that close a likeness as he was "much older." After examining all of the photographs,[7] we are persuaded, consistent with the trial court's position, that a sufficient number of those in the array were similarly complected. Moreover, all of the individuals depicted were within the same general age range, wearing facial hair, standing in front of a consistent background, and wearing button-down shirts with collars. Our review of the array therefore leads us to conclude that the trial court did not err in ruling that it was not unnecessarily suggestive.[8]

### III.

■ Next, Smith argues that the evidence of his attempted flight from the preliminary hearing was erroneously admitted at trial because there was no reasonable inference that he "fled because of consciousness of guilt of the crime charged." After hearing arguments from both parties and noting defense counsel's objection, the trial court permitted the introduction of such evidence because: Smith's attempted escape from the pretrial hearing was sufficient to create the required inference of consciousness of guilt; the probative value of the flight evidence otherwise outweighed the prejudicial effect; and Smith's arguments discounting the flight evidence more appropriately went to the weight of the evidence to be evaluated by the jury rather than to its admissibility.[9] We review the trial court's

---

**7.** The array is a part of the appellate record.

**8.** The trial judge also ruled that the identifications were reliable. While there was a significant amount of time between the robbery and the identifications, the trial judge noted that Kearney and Williams were able to observe the perpetrator both before and during the crime, were able to do so in an area with good lighting, and were positive in their identifications. *See Long v. United States,* 687 A.2d 1331, 1337 (D.C.1996) (quoting *Manson v. Brathwaite,* 432 U.S. 98, 114, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977), and listing factors to be considered in a reliability analysis); *cf. Beatty v. United States,* 544 A.2d 699, 701 (D.C.1988).

**9.** The trial court characterized its ruling in the following manner:

> The case authorities are quite clear that escape from confinement ... is sufficient to create consciousness of guilt....
>
> * * *
>
> Nor do we have or will we have particularly prejudicial evidence coming out of this incident itself.
>
> * * *
>
> Given these conditions, it seems to me that this is a matter that goes to the weight that should be given to the evidence by the jury and I'm going to admit the evidence. I've considered the arguments of the Defense, I've weighed the probative value versus the prejudicial effect. I think the probative value would outweigh the prejudicial effect and the evidence will be admitted.
>
> Finding no cases in the District of Columbia discussing the admissibility of flight evidence in a similar situation (*i.e.,* attempted flight from custody and/or confinement fol-

ruling under an abuse of discretion standard. *See Williamson v. United States,* 445 A.2d 975, 982 (D.C.1982).

■ It is well settled in this jurisdiction that evidence of flight or disappearance can be admitted at trial as evidence of consciousness of guilt. *See id.; see also In re T.L.L.,* 729 A.2d 334, 341–42 (D.C. 1999); *In re M.I.W.,* 667 A.2d 573, 576–77 (D.C.1995); *Logan v. United States,* 489 A.2d 485, 489 (D.C.1985); *Scott v. United States,* 412 A.2d 364, 371 (D.C.1980). In light of the nature of such evidence, however, "we have required the trial court to carefully consider the facts in each case and to determine whether the probative value of [flight] testimony is outweighed by the potential for prejudicial impact." [10] *Williamson, supra,* 445 A.2d at 981; *see also Logan, supra,* 489 A.2d at 489. Accordingly, "[a] flight instruction is improper unless the evidence reasonably supports the inference that there was flight or concealment and that the defendant fled because of consciousness of guilt and actual guilt of the crime charged." *Scott, supra,* 412 A.2d at 371; *see also Logan, supra,* 489 A.2d at 489; *Williamson, supra,* 445 A.2d at 981. We have also stated, "even when there is a sufficient foundation for giving the instruction, the court must fully apprise the jury that flight may be

lowing a preliminary hearing), the trial court consulted authority from outside this jurisdiction in rendering its decision. In particular, the trial judge found instructive the cases of *Bedford v. State,* 317 Md. 659, 566 A.2d 111 (1989), and *United States v. Myers,* 550 F.2d 1036 (5th Cir.1977). In the former case, the government sought to admit evidence that Bedford, who had left his court holding cell, was trying to evade detection inside a courthouse, thereby giving rise to an inference of guilt. *See Bedford, supra,* 566 A.2d at 113–14. The Maryland Court of Appeals permitted the introduction of such evidence, but indicated that Bedford would be free to argue that his actions did not give rise to such an inference to the jury. *See id.* In *Myers,* the Fifth Circuit constructed the following analytical paradigm to guide a trial judge's decision whether to admit flight evidence:

> [The] probative value [of evidence of flight] as circumstantial evidence of guilt depends upon the degree of confidence with which four inferences can be drawn: (1) from the defendant's behavior to flight; (2) from flight to consciousness of guilt; (3) from consciousness of guilt to consciousness of guilt concerning the crime charged; and (4) from consciousness of guilt concerning the crime charged to actual guilt of the crime charged.

*Myers, supra,* 550 F.2d at 1049; *see also United States v. Hankins,* 931 F.2d 1256, 1261–62 (8th Cir.1991) (applying the *Myers* inquiry and holding evidence of defendant's escape from jail was properly admitted); *United States v. Dillon,* 870 F.2d 1125, 1126–27 (6th Cir.1989) (applying the *Myers* inquiry and noting that the Fourth, Seventh, Eighth, Ninth, and Eleventh Circuit Courts of Appeals have recognized that test). After assuming the first two inferences, the trial judge concluded that the *Myers* test was satisfied because there was no other crime from which Smith might be fleeing, and because his attempted escape from confinement was sufficient to create a consciousness of guilt for the charged crime. The trial judge also cited *Sorrell v. State,* 315 Md. 224, 554 A.2d 352, 353–54 (1989) (ruling jury could consider evidence of defendant's failure to reappear after a trial recess); *State v. Ford,* 259 Iowa 744, 145 N.W.2d 638, 641 (1966) (evidence of flight from prison confinement admissible), *overruled in part on other grounds by State v. Bester,* 167 N.W.2d 705 (Iowa 1969), and *State v. Thomas,* 63 Wash.2d 59, 385 P.2d 532, 534 (1963) (evidence of flight from prison confinement admissible), *overruled in part on other grounds by State v. Rogers,* 83 Wash.2d 553, 520 P.2d 159 (1974).

**10.** While we have not formally adopted the test in *Myers, supra,* the Fifth Circuit's analytical paradigm in that case may be useful, as the trial court acknowledged, in determining whether the probative value of flight evidence is outweighed by its prejudicial effect. *See Hankins, supra* note 9, 931 F.2d at 1261–62. Indeed, one of our early precedents, discussing the circumstances under which it is appropriate to provide a flight instruction, cites to *Myers. See Scott, supra,* 412 A.2d at 371.

prompted by a variety of motives 'and thus of the caution which a jury should use before making the inference of guilt from the fact of flight.' " *Logan, supra,* 489 A.2d at 489 (quoting *Austin v. United States,* 134 U.S.App.D.C. 259, 261, 414 F.2d 1155, 1157 (1969)).

 Although the evidentiary issue in this case does not, as the trial judge noted, implicate the type of flight evidence most commonly seen by courts, *i.e.,* flight from the scene of a crime or upon perception of law enforcement, flight evidence can include escape or attempted escape from confinement or custody. *See, e.g., Hankins, supra* note 9, 931 F.2d at 1261–62; *Myers, supra* note 9, 550 F.2d at 1049; *Bedford, supra* note 9, 566 A.2d at 113–14; *Sorrell, supra* note 9, 554 A.2d at 353–54; *Ford, supra* note 9, 145 N.W.2d at 641; *Thomas, supra* note 9, 385 P.2d at 534; 2 McCormick on Evidence § 263, at 173 (5th ed.1999); 2 Wigmore, Evidence § 276 (Chadbourn rev.1979). Such evidence, therefore, may be admissible pursuant to the legal principles outlined above. *Cf. Williamson, supra,* 445 A.2d at 981–82 (evidence of appellant's disappearance after he was indicted and released on bond held admissible).

 In this case, the trial court concluded that the probative value of the flight evidence outweighed its prejudicial effect, in part because the evidence concerning Smith's attempted escape from the courtroom and his attendant custody "reasonably support[ed] the inference that [he] fled because of consciousness of guilt" of the charges resulting from the Checkers

robbery. *Williamson, supra,* 445 A.2d at 981. We agree with this ruling, as both the timing and location of Smith's flight support this position. The record reveals that Smith's attempted flight from the courtroom occurred immediately after the conclusion of the preliminary hearing on the underlying charges where, we assume, Smith was made aware of the charges against him and, among other issues, bail was discussed for those charges. Nothing in the record suggests that Smith's flight could be linked to any other criminal conduct. *See Hankins, supra* note 9, 931 F.2d at 1262 ("[T]here is nothing in the record to suggest that [appellant] escaped because he felt guilty about some other offense. . . ."). Furthermore, Smith's argument that his attempted flight was in reaction to the court's bail ruling does not render the flight evidence inadmissible. Rather, in this situation, it is more properly "considered by the jury in weighing the effect of such flight." [11] *Sorrell, supra* note 9, 554 A.2d at 354 (quoting 1 Wharton's Criminal Evidence § 214, at 450). As long as the circumstances *reasonably support an inference* that Smith fled because of consciousness of guilt of the charges relating to the Checkers robbery, and the probative value of the flight evidence is not outweighed by the potential prejudicial impact on the jury, such evidence may be admitted, and the corresponding instruction may be given. Because such an inference was present in this case, and because the trial judge endeavored a considered prejudice inquiry and properly instructed the jury,[12] we conclude

11. We note that Smith's counsel provided the same explanation for Smith's flight to the jury during closing argument.

12. After all the evidence was presented in this case, the trial court issued the following instruction to the jury:

Now, flight may be motivated by a variety of factors which are fully consistent with innocence. Flight does not create a presumption of guilt, nor does it necessarily reflect guilt—reflect that the person has feelings of guilt.

there was no abuse of discretion and, thus, decline to disturb the trial court's evidentiary ruling.[13]

### IV.

■ Finally, Smith argues that the trial court erred in denying his motion for judgment of acquittal because there was insufficient evidence to support the "while armed" component of his armed robbery conviction.[14] Specifically, Smith contends that "the act of putting one's hand in their pocket and uttering the words 'stay back or I'll shoot' during the course of an attempt to steal money" does not satisfy the requirements of D.C.Code § 22–3202(a).

■ Considered an enhancement provision rather than a separate criminal offense, *see Thomas v. United States*, 602 A.2d 647, 650 (D.C.1992), D.C.Code § 22–3202(a) provides additional penalties for any person who is found to have committed:

> In addition, because innocent persons sometimes feel guilty, such feelings do not necessarily reflect actual guilt. On the other hand, you may consider flight as a circumstance tending to show feelings of guilt and you may also consider feelings of guilt as evidence tending to show actual guilt, but you are not required to do so. However, under no circumstances may you presume that Defendant is guilty merely because he tried to flee.
> If you find evidence of flight, you should consider and weigh such evidence along with all the other evidence and give it the weight that you think it deserves.

This instruction employs the flight instruction contained in Criminal Jury Instructions for the District of Columbia, No. 2.44 (4th ed.1993), and satisfies the requirements set forth in *Logan, supra.*

13. Even if we had been persuaded that the probative value of such evidence was outweighed by the prejudicial effect, any error would have been harmless. *See Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct.

a crime of violence, or a dangerous crime in the District of Columbia when armed with or having readily available any pistol or other firearm (or imitation thereof) or other dangerous or deadly weapon (including a sawed-off shotgun, shotgun, machine gun, rifle, dirk, bowie knife, butcher knife, switchblade knife, razor, blackjack, billy, or metallic or other false knuckles)....

D.C.Code § 22–3202(a). Accordingly, because the underlying indictment charged Smith with armed robbery with a pistol or imitation thereof, the government needed to establish beyond a reasonable doubt that Smith possessed or, at minimum, had readily available a pistol or imitation thereof during the incident. In denying the motion for judgment of acquittal, the trial court ruled that, despite the fact that no gun was ever recovered and there was no testimony that any witness actually saw a pistol (or imitation thereof) on Smith's person, the jury could have permissibly inferred from the circumstantial evidence that Smith had such a weapon (or imitation

1239, 90 L.Ed. 1557 (1946) (trial court error harmless if appellate court can say "with fair assurance ... that the judgment was not substantially swayed by the error"). Defense counsel was given full opportunity to explain any arguments on this issue to the jury. Also, the jury was instructed that Smith's flight could have been motivated by a number of factors and was told they were free to disregard such evidence and treat it with the weight they deemed appropriate. Moreover, the government's case, aside from the flight evidence, was otherwise strong.

14. The record reflects that Smith's counsel moved for acquittal on this basis both during trial and after it. For the sake of clarity, since his motions raised the identical issue, we refer to them in the singular. On appeal (and at trial), Smith only challenges the sufficiency of the evidence of the armed enhancement to his robbery conviction, not the robbery conviction itself.

thereof) in his pocket during the robbery.[15] We agree.

 "In evaluating a claim of evidentiary sufficiency, we must view the evidence in a light most favorable to the government, recognizing the jury's province to weigh the evidence, determine the credibility of witnesses, and make justifiable inferences from the evidence." *Peterson v. United States*, 657 A.2d 756, 760 (D.C.1995). "[R]eversal for insufficiency of the evidence will be warranted 'only if there is no evidence upon which a reasonable mind might fairly conclude guilt beyond a reasonable doubt.' " *Id.* (quoting *In re R.H.M.*, 630 A.2d 705, 707 (D.C.1993)). Put another way, the relevant question on appeal is whether, after viewing the evidence in a light most favorable to the government, a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Like the trial court, we do not distinguish between direct and circumstantial evidence in our review of the denial of a motion for judgment of acquittal. *See Taylor v. United States*, 662 A.2d 1368, 1371 n. 7 (D.C. 1995); *Paris, supra* note 15, 515 A.2d at 204 ("Direct evidence that a dangerous weapon was used is not necessary to a conviction of an armed offense; circumstantial evidence will suffice."); *Boyd v. United States*, 473 A.2d 828, 832 (D.C. 1984).

In the past, we have had the opportunity to evaluate "sufficiency of the evidence" arguments in similar factual situations. In *Boyd, supra*, we upheld a conviction of armed rape when no direct evidence was introduced to establish that the defendant

---

**15.** The trial court instructed the jury that "[a]n imitation pistol is any object that resembles an actual pistol closely enough that a person observing it in the circumstances would reasonably believe it to be a pistol." Smith argues that because the legislature did not define an "imitation firearm" under section 22–3202 and because we have never squarely defined that term in this context, *see Bates v. United States*, 619 A.2d 984, 985 (D.C.1993), the trial court's use of the term "any object" was over-inclusive, thereby rendering the jury instruction erroneous. Smith argues for a narrow construction of the term "imitation firearm," suggesting that it "should not include the use of a person's hand to stimulate the presence of a firearm." As in *Bates*, however, we are satisfied there was sufficient evidence to establish the inference that Smith possessed a real or imitation pistol.

While Smith is correct that we have never directly defined "imitation firearm" under § 22–3202, we have provided some guidance on the issue and hold, in this case, there was no error in the trial court's instruction. In *Meredith v. United States*, 343 A.2d 317, 320 & n. 5 (D.C.1975), we indicated that an imitation pistol should be considered a dangerous or deadly weapon under § 22–3202 and that "[t]estimony that an object which appeared to be a gun was involved is sufficient to show use of a dangerous weapon." In *Paris v. United States*, 515 A.2d 199, 204 (D.C.1986), we stated that "any object which the victim perceives to have the apparent present ability to produce great bodily harm can be considered a dangerous weapon" under § 22–3202. Similarly, in *Thomas, supra*, 602 A.2d at 651 n. 14, we noted that a dangerous weapon under § 22–3202 can include an instrument "utilized by a perpetrator in order to make the victim believe that the perpetrator is armed with or has readily available a dangerous weapon." The trial court's instruction therefore was consistent with prior case law. It is also nearly identical to the instruction we refused to find erroneous in *Bates, supra. See* 619 A.2d at 985.

It should be noted, however, that our decision in this case does not necessarily implicate Smith's characterization of the imitation firearm. The jury, after hearing all of the evidence, could have reasonably believed that Smith's hand was *accessing* an imitation firearm in his pocket rather than actually *making* an imitation firearm. In any event, we simply hold there was sufficient evidence for a jury to have found that Smith committed the robbery while armed pursuant to § 22–3202.

actually possessed a knife during the rape. *See* 473 A.2d at 832. In that case, the complainant did not expressly testify that she saw or felt a knife, the government did not introduce the actual knife into evidence, and photographs taken immediately following the crime showed no knife marks on the complainant's neck. *See id.* Under our appellate standard of review, however, we nevertheless concluded there was sufficient evidence to satisfy the requirements of § 22–3202(a) primarily because the complainant's testimony was "replete with circumstantial statements" indicating that a knife was used during the crime.[16] *Id.* In *Bates, supra* note 15, 619 A.2d at 985–86, we sustained an armed robbery conviction on testimony that an object felt like a gun and that the silver object in defendant's hand "looked like a gun," yet no gun was ever found and, consistent with the defendant's testimony, a five-inch metal pipe was ultimately recovered near the defendant's home. Finally, in *Paris, supra* note 15, we affirmed an armed robbery conviction, despite the fact that no one actually saw a weapon during the commission of the robbery, because there was evidence that a store clerk felt a hard object thrust into his ribs, that one of the assailants kept his right hand in his jacket pocket as he marched the clerk toward the rear of the store, and that the assailants later fired a weapon at the police. *See* 515 A.2d at 203–04. Our decisions in all of these cases relied almost exclusively on circumstantial evidence to reach the ultimate conclusion that there was sufficient evidence to reasonably determine that the respective appellants satisfied the "armed" requirements of § 22–3202.[17] *See State v. Jolly,* 442 Mich. 458, 502 N.W.2d 177, 182 (1993) (holding in a similar situation that requiring a firearm or dangerous weapon to "be seen ... or recovered from a defendant would not only be unrealistic, [it would] run[ ] counter to established case law holding that the essential elements of a crime may be proven by circumstantial evidence").

Addressing a similar issue in a slightly different context, two federal cases in this jurisdiction are also instructive. In *United States v. Ray,* 305 U.S.App.D.C. 386, 21 F.3d 1134 (1994), and *United States v. Levi,* 310 U.S.App.D.C. 152, 45 F.3d 453 (1995), the District of Columbia Circuit discussed the requirements of the federal crime of aggravated bank robbery under 18 U.S.C. § 2113(d) (1994).[18] In *Ray,* the appellant robbed the same bank twice, each time using the same *modus operandi.* On both occasions, he approached a teller and told her to give him cash or her would "blow [her] head off." *Ray, supra,* 305 U.S.App.D.C. at 387, 21 F.3d at 1135. While the tellers involved never saw a weapon, they did note that he moved his hands a lot and put one of his hands in his pocket. *See id.* No weapon was ever recovered.

**16.** These circumstantial statements included "put a knife to my throat," "kept the knife at my throat," and "still had the knife at my throat." *Boyd, supra,* 473 A.2d at 832. We also expressed our reluctance to "disturb the[ ] judgment [of the trial court and the jury] that she perceived a knife" because they "had the benefit of seeing the witness testify." *Id.*

**17.** Appellant attempts to distinguish *Bates, supra,* and *Paris, supra,* on the basis that those cases involved situations where a victim was actually touched by an instrument believed to be a firearm. While this may be true, such a *per se* distinction is contrary to our fundamental task, namely to determine whether there was sufficient evidence, circumstantial or direct, to convict appellant of armed robbery.

**18.** A violation of this offense occurs when, in the course of robbing a bank, a robber "assaults any person, or puts in jeopardy the life of any person by the use of a dangerous weapon or device...." 18 U.S.C. § 2113(d).

On these facts, the District of Columbia Circuit reversed the appellant's convictions of aggravated bank robbery and remanded for a new trial because the given jury instruction impermissibly "authorized the jury to convict on the aggravated bank robbery charges regardless whether Ray had a weapon hidden in his pocket." *Id.* at 388, 21 F.3d at 1136. The court in *Ray* held that a defendant must either display an ostensibly dangerous weapon or possess a concealed weapon in order to be convicted under § 2113(d). More pertinent to this case, however, the District of Columbia Circuit theorized that a jury reasonably could have found that Ray was armed because:

> there was proof that Ray possessed a firearm each time he robbed the bank. The most telling item consisted of Ray's threat to blow the teller's head off. Loaded guns are capable of just that. From Ray's threat, therefore, one could reasonably infer—the teller certainly did—that Ray meant what he said and that he had a gun to back it up. Ray's reaching into his pocket while uttering his threat increases the probability that the teller was right. The testimony of the get-away driver points in the other direction, but when we view what the prosecution presented in a light most favorable to it, we believe a jury reasonably could find that Ray had a firearm.

*Id.* at 393, 21 F.3d at 1141 (footnote omitted).

In *Levi*, the District of Columbia Circuit expounded on its decision in *Ray*. Therein, the appellant was convicted of seven counts of aggravated bank robbery for seven separate robberies. In five of the robberies, the appellant "stated either orally or in writing (or both) that he had a gun." *Levi, supra,* 310 U.S.App.D.C. at 156, 45 F.3d at 457. He also made gestures supporting his statement(s) that he was armed in three of those five offenses. *See id.* In the midst of the sixth robbery, the appellant kept one of his hands in his pocket and informed a teller that he would "blow [his] head off." *Id.* Finally, during the course of the seventh robbery "he passed the teller a note (which the teller did not read) and lifted his coat, revealing to the teller a brown object that the teller understood to be the handle of a gun." *Id.* In ruling there was sufficient evidence to support all of Levi's convictions for aggravated bank robbery under § 2113(d), the District of Columbia Circuit relied almost exclusively on the defendant's statements indicating he possessed a gun.[19] *See id.*

Appellant principally relies on *State v. Suniville,* 741 P.2d 961 (Utah 1987), to support his argument that the evidence presented was insufficient to support his conviction under § 22–3202. In *Suniville,* there was evidence that the appellant robbed a credit union with his right hand concealed inside his coat pocket (which he lifted over the bank counter during the incident). *See id.* at 962. An eyewitness testified that the appellant stated, "This is a robbery, don't turn it into a homicide" and "If anyone tries to follow me, I will blast you." *Id.* Yet no gun was ever found, and there was no testimony that anyone actually saw a gun during the course of the robbery. *See id.* On those facts, the Supreme Court of Utah vacated appellant's aggravated robbery conviction because his

---

**19.** Indeed, in *Levi, supra,* the District of Columbia Circuit suggested that a robber's statement indicating possession of a dangerous weapon can be sufficient, by itself, to support a conviction under the federal aggravated bank robbery statute. *See* 310 U.S.App.D.C. at 156, 45 F.3d at 457. Because additional evidence exists in this case, we need not decide whether Smith's statement that he would "shoot" would alone be sufficient to support his conviction. *Cf. Jolly, supra,* 502 N.W.2d at 181.

"menacing gesture accompanied by verbal threats [were] not sufficient evidence alone to establish the use of a firearm or a facsimile [thereof]." *Id.* at 965; *see also McArthur v. State,* 862 P.2d 482, 484 (Okla.Crim.App.1993) (citing *Suniville, supra,* and holding that evidence that appellant had a hand in a bag and said, "This is a stick up," combined with eyewitnesses belief that appellant possessed a gun was insufficient to prove use of a dangerous weapon).

The *Suniville* decision, however, is predicated on a different, narrowly-construed statutory scheme, and principally relies upon a decision, *Williams v. Commonwealth,* 721 S.W.2d 710, 712–13 (Ky.1986), which has been, at minimum, diminished by the holding in a subsequent decision of the Supreme Court of Kentucky more factually akin to this case. *See Swain v. Commonwealth,* 887 S.W.2d 346, 347–48 (Ky.1994); *see also Thomas v. Campbell,* 47 F.3d 1170, 1995 U.S.App. LEXIS 1664 (6th Cir.1995). Furthermore, on a more fundamental level, we believe it "runs counter to established case law holding that the essential elements of a crime may be proven by circumstantial evidence." *Jolly, supra,* 502 N.W.2d at 182 (holding on facts similar to those in this case and in *Suniville, supra,* that there was sufficient circumstantial evidence to submit an armed robbery question to the jury); *cf. State v. Harrigan,* 447 A.2d 1194, 1196–97 (Del.Super.Ct.) (upholding armed robbery conviction where defendant demanded money while thrusting his hand into his pocket and threatening to shoot, and indicating "[c]ircumstantial evidence ... may be relied upon by the State to prove its criminal case"), *aff'd,* 447 A.2d 1191 (Del. 1982). To the extent it does, it is also inconsistent with our prior case law, *see, e.g., Paris, supra* note 15, 515 A.2d at 203–04 (circumstantial evidence can suffice to support a conviction of an armed offense),

and that of the District of Columbia Circuit, *see, e.g., Levi, supra,* 310 U.S.App. D.C. at 156, 45 F.3d at 457.

In this case, there is evidence that Smith "verbally brandishe[d]" a weapon. *Ray, supra,* 305 U.S.App. D.C. at 394, 21 F.3d at 1142. Two restaurant employees who witnessed the crime, Williams and Kearney, testified that Smith threatened to shoot Washington, the restaurant manager, when Washington began to approach the take-out window. Williams testified that Smith "told [the manager] to the stay the * * * * back before he shoot him." According to Kearney, Smith's exact words were "Move—move back or I'll shoot." Furthermore, there was testimony that Smith's right hand was in his right jacket pocket which, in turn, was pointed through the take-out window toward the direction of Williams and Kearney during the robbery. Indeed, Smith's gestures during the robbery were so consistent with someone possessing a firearm that both Williams and Kearney believed he had a gun. Viewing this evidence in a light most favorable to the government and recognizing the jury's "province to weigh the evidence, determine the credibility of witnesses, and make justifiable inferences from the evidence," we hold there was sufficient evidence upon which a reasonable mind might fairly conclude that Smith was guilty of armed robbery. *Peterson, supra,* 657 A.2d at 760. Therefore, we do not disturb the jury verdict and the trial judge's denial of Smith's motion for judgment of acquittal.

In light of the foregoing, the judgment of the trial court is

*Affirmed.*

FARRELL, Associate Judge, concurring:

For the maximum sentence to be enhanced under D.C.Code § 22–3202(a), the defendant must actually have been armed with or had readily available a firearm (or

imitation thereof) or other dangerous weapon; it is not enough that he *appeared to be* armed if in fact he was not. So it is naturally troublesome when, as in this case, the proof of actual possession consists entirely of evidence that appellant behaved *as though* he was armed with and prepared to use a gun, but no gun was found on him (he was not arrested until much later), he neither fired it nor brandished it openly during the crime, and no one actually saw it. Yet, as Judge Gallagher demonstrates, our decisions are exceedingly difficult to reconcile with the notion appellant advances that there must have been an actual sighting or feeling of the weapon before the defendant may be found to have been armed.* If, as we have held, "circumstantial evidence will suffice" to prove "that a dangerous weapon was used," *Paris v. United States,* 515 A.2d 199, 204 (D.C.1986), that must mean that other proof besides "direct" evidence of seeing or feeling the weapon can suffice. Also, it is doubtful that the authors of the enhancement statute meant to exempt from its reach a defendant who commits an armed crime while successfully masking the weapon, or to make enhancement depend on the fortuity of his arrest on the scene and recovery of the weapon. Appellant gave strong circumstantial evidence of his possession of a gun and intent to use it if his demands were unmet. Had he been apprehended at the scene and no gun been found on him, that proof nonetheless would have failed. *See United States v. Levi,* 310 U.S.App.D.C. 152, 156, 45 F.3d 453, 457 (1995). But under our decisions, the evidence here was legally sufficient.

---

* Citing some of our cases, appellant appears to concede that "a bulge in the pocket" or "the outline of a gun visible through the pocket material" would be sufficient proof that he was armed, but exactly how such a bulge or outline differs from the pointed object the victims perceived him to hold in his pocket he does not say.