# District of Columbia
# Court of Appeals

**No. 12-CF-2018**

WARREN B. WASHINGTON,

Appellant,



FILED

APR – 7 2016

DISTRICT OF COLUMBIA
COURT OF APPEALS

v.

**CF3-2118-12**

UNITED STATES,

Appellee.

On Appeal from the Superior Court of the District of Columbia
Criminal Division

BEFORE: WASHINGTON, *Chief Judge*; FISHER, *Associate Judge*; and BELSON, *Senior Judge*.

**J U D G M E N T**

This case came to be heard on the transcript of record and the briefs filed, and was argued by counsel. On consideration whereof, and as set forth in the opinion filed this date, it is now hereby

ORDERED and ADJUDGED that the appellant's convictions are affirmed.

For the Court:

*Julio A. Castillo*

JULIO A. CASTILLO
Clerk of the Court

Dated: April 7, 2016.

Opinion by Chief Judge Eric T. Washington.

Concurring opinion by Chief Judge Eric T. Washington.

Concurring opinion by Associate Judge John Fisher.

*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 12-CF-2018

FILED 4/7/16
District of Columbia
Court of Appeals

Julio Castillo
Clerk of Court

WARREN B. WASHINGTON, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court of the
District of Columbia
(CF3-2118-12)

(Hon. Stuart G. Nash, Trial Judge)

(Argued March 11, 2015               Decided April 7, 2016)

*Shilpa S. Satoskar*, Public Defender Service, with whom *James Klein* and *Jaclyn S. Frankfurt*, Public Defender Service, were on the brief, for appellant.

*Christopher Howland*, Assistant United States Attorney, with whom *Ronald C. Machen Jr.*, United States Attorney at the time the brief was filed, *Elizabeth Trosman*, *Jodi Steiger Lazarus*, and *Ann K. H. Simon*, Assistant United States Attorneys, were on the brief, for appellee.

Before WASHINGTON, *Chief Judge*, FISHER, *Associate Judge*, and BELSON, *Senior Judge*.

Opinion for the court by *Chief Judge* WASHINGTON.

Concurring opinion by *Chief Judge* WASHINGTON at page 13.

Concurring opinion by *Associate Judge* FISHER at page 21.

WASHINGTON, *Chief Judge*: Warren B. Washington ("Appellant") challenges his convictions following a jury trial for three counts of assault with a dangerous weapon ("ADW")[1] and three counts of possession of a firearm during a crime of violence ("PFCV").[2] On appeal, appellant argues that the trial court erroneously answered a jury note requesting clarification on the definition of "imitation firearm" with an over-broad definition that permitted the jury to convict appellant of ADW and PFCV even if it believed that the object appellant pointed at the complainants was a cell phone, as opposed to a firearm, replica firearm, or other dangerous weapon. Because the trial court's instruction in response to the jury question was consistent with this court's case law involving the use of imitation firearms, we affirm appellant's convictions.

## I.

### A. The Government's Evidence

On January 27, 2012, at approximately 8:00 p.m., appellant's former girlfriend, Lashon Jones, asked Harry Williams, a longtime friend of hers with

---

[1] D.C. Code § 22-402 (2012 Repl.).

[2] D.C. Code § 22-4504 (b) (2012 Repl.).

whom she had recently reconnected, to drive her and her daughter to her aunt's home, which was located a block from appellant's home. After Ms. Jones's daughter exited the car, Ms. Jones became fearful that appellant would arrive, as appellant had repeatedly accused Ms. Jones of being in a relationship with Mr. Williams. Thus, Ms. Jones told Mr. Williams that he should leave. Ms. Jones's fear was realized when appellant arrived before Mr. Williams could pull off and demanded that Ms. Jones exit Mr. Williams's vehicle. Ms. Jones refused and appellant again accused her of having a sexual relationship with Mr. Williams, attempted to open the car doors, which were locked, and threatened Mr. Williams, stating that there would be trouble if Mr. Williams did not put Ms. Jones out of his car.

During the exchange, appellant was "reaching in his pocket" and "moving his hand in his pocket," gestures that Mr. Williams considered being behavior of someone who has a pistol. Mr. Williams told Ms. Jones that it looked like appellant had a gun and Ms. Jones, who was now screaming, responded, "[W]here did he get a gun from? He can't even afford a pair of pants, so where did he get a gun from?"[3] Mr. Williams then exited his vehicle to speak with appellant, but appellant lifted his right arm toward Mr. Williams, displaying what appeared to be

---

[3] Ms. Jones further responded, "For real, I don't think that was a gun."

the barrel of a gun in his sleeve.[4] Mr. Williams immediately stepped back into his car. Appellant then stepped in front of the car, pointed his extended arm at the windshield, and prevented Mr. Williams from driving off. Appellant then ran the short distance from Mr. Williams's car to the corner, which was more dimly lit, and urged Mr. Williams to drive in that direction, all while continuing to display what appeared to be the barrel of a gun in the sleeve of his extended arm. Ms. Jones shouted that appellant had a gun and Mr. Williams attempted to make a U-turn in the middle of the block to avoid driving to the less-well-lit corner where appellant was standing. Seeing this, appellant ran back to Mr. Williams's car, now fully displaying what Mr. Williams described as a .380 caliber pistol. Once at the car, appellant resumed ordering Ms. Jones out of the vehicle and attempted to open the passenger-side door.

At this time, Dwayne Frost, Ms. Jones's cousin, who lived at Ms. Jones's aunt's house, tried to intervene. Appellant turned toward Mr. Frost and stated

---

[4] There was conflicting testimony regarding whether appellant pointed a gun at the complainants. Whereas Mr. Williams testified definitively that appellant pointed a gun at him and Ms. Jones, Ms. Jones testified that appellant had his right arm raised and slightly extended and that she saw "a little black . . . square part in his sleeve." Ms. Jones further testified that she did not know what the object was, could not tell whether the object was a gun because appellant was too far away, and did not see the entire object because appellant did not pull it out. Ms. Jones also testified that she thought the object looked similar to the barrel of a gun.

"[Y]ou don't want this issue," while putting his hand back into his pocket and lifting it slightly. Mr. Frost then stepped back, said "Oh, you got a gun," and "I got something for you," and retreated back to his house.[5] Appellant turned toward Ms. Jones and threatened, "B----, somebody's going to die tonight."

Mr. Williams hesitated to drive away because he was concerned that appellant would shoot him and Ms. Jones through the windshield. Appellant eventually ran to Mr. Williams's car door and with his gun in Mr. Williams's face, grabbed the steering wheel just as Mr. Williams engaged the gears. The car lurched forward and appellant either let go or lost hold of the steering wheel. The vehicle then fishtailed and crashed into a parked SUV. Before Mr. Williams could free himself, appellant reached through the window and punched Mr. Williams in the face.

Upon hearing the collision, the owner of the SUV came outside and announced that she was calling the police. Neighbors and Mr. Williams also called the police, but appellant fled before they arrived. Moments after police arrived, appellant drove by the scene, and Ms. Jones, Mr. Williams, and Mr. Frost each

---

[5] Mr. Frost testified that he made this statement out of instinct rather than perception of an actual firearm.

identified appellant. Two or three days later, Mr. Frost had a friendly conversation with appellant in which Mr. Frost asked appellant if he had a gun on the night of the crash, to which appellant responded that he had been carrying a cell phone, not a gun.

## B. The Jury Instruction

During discussions regarding the final jury instructions, the government noted that the ADW counts, like the PFCV counts, were charged as having been committed "with a firearm or imitation thereof" and therefore argued that the general ADW jury instruction should include the phrase "firearm or imitation thereof" because of the indicted charges and the fact that no gun was ever recovered. Defense counsel did not object initially, but argued, upon reconsideration, that the phrase "imitation thereof" should be excluded because the ADW statute, unlike the PFCV statute, does not allow a defendant to be convicted based on possession or use of an imitation firearm absent evidence that the object could have been used in a manner likely to cause death or serious bodily injury. Over defense counsel's objection, the trial court instructed the jury for the ADW counts as follows:

> The first count with which the defendant is charged is assault with a dangerous weapon against Lashon Jones. The elements of this offense, each of which the Government must prove beyond a reasonable doubt, are, first, that the defendant committed a threatening act that reasonably would create in another person a fear of immediate injury. Second, the defendant acted voluntarily and on purpose, not by mistake or accident. Third, that at the time the defendant had the apparent ability to injure Lashon Jones. And, fourth, that the defendant committed the threatening act with a dangerous weapon; that is, a firearm or imitation thereof. An object is a dangerous weapon if it is designed to be used, actually used, or threatened to be used in a manner likely to produce death or serious bodily injury.[6]

Two hours into deliberations, the jury sent the following note: "Can an object that is not a gun (or other truly dangerous weapon) – such as a cell phone – but is brandished in a manner so as to give the impression that it is a dangerous weapon, count as "an imitation thereof," as set forth in [the ADW counts]?"

---

[6] Appellant does not challenge the original instructions and the instructions were the same for each complainant. The trial court also instructed the jury for the PFCV counts as follows:

> The fourth count with which the defendant is charged is possession of a firearm during a crime of violence, that crime of violence being the assault with a dangerous weapon against Lashon Jones, charged as count 1. The elements of this offense, each of which the Government must prove beyond a reasonable doubt, are, first, that the defendant possessed a firearm or an imitation firearm. Second, he possessed the firearm or imitation firearm while committing a crime of violence. And, third, that he did so voluntarily and on purpose, not by mistake or accident.

Defense counsel argued that the answer was simply "no" for the same reasons articulated in her objection to the original instruction. The trial court then proposed repeating the portion of the instruction defining "dangerous weapon" for the jury and then telling the jury that they are welcome to write another note if they have any additional questions. Defense counsel stated that she had no objection and the trial court sent the jury a written copy of the original ADW instruction.[7]

The next day, the government proposed a supplement to the trial court's response to the jury note by adding the following language derived from the Comments to Criminal Jury Instruction 4.101 (ADW): "If the Defendant uses an object that is not a dangerous weapon in a manner that leads the complainant to believe, mistakenly but reasonably, that it is an object that would cause death or serious bodily injury, then the object is a dangerous weapon." Defense counsel objected to the additional proposed language, arguing that the language was a misstatement of the law and conflated the standards for ADW and "while armed."[8] Defense counsel then proposed different language, also found in the Comments to

---

[7] Appellant does not challenge the trial court's decision to repeat the "dangerous weapon" portion of the jury instruction.

[8] Unlike the ADW statute, the District's "while armed" statute explicitly allows for conviction where the defendant committed a crime of violence with an "imitation firearm." *See* D.C. Code § 22-4502 (2012 Repl.).

Instruction 4.101: "Voluntarily pointing an object not designed to be or commonly considered to be a weapon cannot rise to the level of threat necessary to make the object dangerous."

Pointing to this court's prior decisions in *Perry v. United States*, 36 A.3d 799, 812 (D.C. 2011) and *Harris v. United States*, 333 A.2d 397, 400 (D.C. 1975), the trial court concluded that imitation firearms are considered dangerous weapons in the ADW context. The trial court further noted that in *Smith v. United States*, 777 A.2d 801, 810 n.15 (D.C. 2001), a case involving armed robbery, this court approved a jury instruction providing that: "An imitation pistol is any object that resembles an actual pistol closely enough that a person observing it in the circumstances would reasonably believe it to be a pistol."

In response, defense counsel argued that the "while armed" statute is broader and thus the *Smith* instruction would be erroneous if given in the instant case, which concerned ADW. In response, the trial court noted that ADW requires use of an inherently dangerous weapon and, under *Perry*, imitation firearms are considered inherently dangerous. Based on this reasoning, the trial court rejected defense counsel's argument and then asked defense counsel to choose between the instruction that the government proposed and the *Smith* instruction. Without

waiving her previously-stated objection, defense counsel chose the latter, for the sole reason that this court had sanctioned the instruction.

The trial court then supplemented its earlier instruction to the jury with the following:

> As you are aware, your note requesting clarification of the jury instructions came to us at the end of the day yesterday. I felt some time pressure to respond to your note before you left for the day. The response I gave you yesterday is a completely accurate statement of the law. However, I would like to supplement that instruction with a further instruction that might, or might not, be relevant to the issue you raised in your note. My supplemented instruction is as follows: An imitation firearm is any object that resembles an actual firearm closely enough that a person observing it in the circumstances would reasonably believe it to be a firearm.

## II.

Appellant argues that the trial court's response to the jury note was reversible error because an imitation firearm must resemble an actual firearm and thus the response was error. We disagree, and affirm appellant's conviction.

This court reviews properly-preserved claims of instructional error *de novo*. *Little v. United States*, 709 A.2d 708, 711 (D.C. 1998).

Guns, which are considered inherently dangerous, include "imitation firearms." *See Ball v. United States*, 26 A.3d 764, 769 (D.C. 2011) (citing *Paris v. United States*, 515 A.2d 199, 204 (D.C. 1986)). In the context of the District's "while armed" statute, this court has approved the following jury instruction regarding imitation firearms: "An imitation pistol is any object that resembles an actual firearm closely enough that a person observing it in the circumstances would reasonably believe it to be a pistol." *See Smith*, 777 A.2d at 810 n.15. Therefore, the trial court's supplemental instruction to the jury, which was almost identical to the approved instruction in *Smith*, was consistent with this court's prior precedent defining imitation firearm in cases involving dangerous weapons. As this court observed in *Harris*, where we upheld a conviction for ADW:

> The primary capacity of a gun to harm . . . plus its apparent capacity to carry out that harm, combined with a highly charged atmosphere and the possibility of action by [] others to prevent the [ongoing crime], is a complex of circumstances in which the person on the scene is in jeopardy of harm which may occur in any one of various ways.

*Harris*, 333 A.2d at 400 (quoting *Baker v. United States*, 412 F.2d 1069, 1071-72 (5th Cir. 1969)).

An imitation firearm is a gun, which is an inherently dangerous weapon for purposes of ADW, and therefore, a defendant may be appropriately charged with ADW where the defendant commits an assault using an imitation firearm. *See Harris*, 333 A.2d at 400. Finally, recognizing that the term "imitation firearm" is not explicitly defined by statute, we have provided some guidance on its meaning. *Cf. Smith*, 777 A.2d at 810 n.15 (approving of a jury instruction providing that: "[a]n imitation pistol is any object that resembles an actual firearm closely enough that a person observing it in the circumstances would reasonably believe it to be a pistol."); *Bates v. United States*, 619 A.2d 984, 985 (D.C. 1993) (similar). Indeed, the trial court gave the *Smith* instruction almost verbatim in this case, substituting the word "firearm" for "pistol."

Further, the government is not required to establish the physical characteristics of the weapon used in order to prove ADW. "Direct evidence that a dangerous weapon was used is not necessary to a conviction of an armed offense; circumstantial evidence will suffice." *Smith*, 777 A.2d at 810 (quoting *Boyd v. United States*, 473 A.2d 828, 832 (D.C. 1984)). "In this jurisdiction, any object

which the victim perceives to have the apparent ability to produce great bodily harm can be considered a dangerous weapon." *Paris*, 515 A.2d at 204. "Only apparent ability through the eyes of the victim" to "inflict great bodily injury" is required to prove ADW. *Harris*, 333 A.2d at 400. Thus, it did not matter whether the object in appellant's hand was objectively physically similar to a firearm. The fact that the victim perceived the item in appellant's hand to be a firearm and the jury credited the victim's testimony that she perceived the item to be a firearm, was enough for that object to be considered a dangerous weapon and thus, the instruction given by the trial court was not error.

Because the trial court's response to the jury note was consistent with this court's more recent interpretation of what constitutes an imitation firearm, appellant's argument that the jury was misled is unavailing and appellant's convictions are

*Affirmed.*

WASHINGTON, *Chief Judge*, concurring: As the majority opinion points out, this court in *Smith v. United States*, 777 A.2d 801, 810 n.15 (D.C. 2001) approved of a jury instruction which defines an imitation firearm as "any object that

resembles an actual pistol closely enough that a person observing it in the circumstances would reasonably believe it to be a pistol." Based on that decision, this panel has concluded that the trial court in this case did not err in instructing the jury that under the circumstances of this case a cell phone could be considered an "imitation firearm." I write separately because I believe the *Smith* court's discussion in footnote 15 impermissibly expanded the definition of "imitation firearm" beyond its plain and ordinary meaning.

The trial court's initial instruction to the jury mirrored the language contained in the indictment for both the PFCV and the ADW offenses and required the jury to find that appellant used "a dangerous weapon; that is a firearm or imitation thereof" during the commission of his crimes in order to be convicted for those offenses. However, based on evidence adduced at trial indicating that the object in appellant's hand might have been a cell phone, as opposed to a firearm, the jury asked the court to clarify the definition of "imitation firearm." After discussing the note from the jury with both counsel, the trial court originally responded by merely reinstructing the jury as it had originally and without further defining "imitation firearm." However, the next morning, at the urging of the government and despite the fact that the court had not received any further communications from the jury, the trial court supplemented its earlier instruction

with the definition from the opinion in *Smith* as outlined above. While the instruction was not erroneous pursuant to this court's precedent, I find this court's continued reliance on *Smith* and its musings about how our case law could be read to support a correlation between the definition of a "dangerous weapon" and that of an "imitation firearm," to be inappropriate considering the *Smith* court merely concluded that the evidence in the case was sufficient to support the jury's verdict that Smith had committed a robbery "while armed," and did not specifically address the use of objects such as the one at issue in this case.

The question before this court in *Smith* was whether "the act of putting one's hand in their pocket and uttering the words 'stay back or I'll shoot' during the course of a robbery satisfied the while armed component of a robbery offense. *Smith*, 777 A.2d at 809. Smith contended that the evidence was insufficient because the only thing that was in his pocket at the time of the robbery was his hand. This court affirmed his conviction stating:

> [O]ur decision in this case does not necessarily implicate Smith's characterization of the imitation firearm. The jury, after hearing all of the evidence, could have reasonably believed that Smith's hand was accessing an imitation firearm in his pocket rather than actually making an imitation firearm. In any event, we simply hold that there was sufficient evidence for a jury to have found that Smith committed the robbery while armed . . .

*Id.* at 810 n.15. However, by affirming the trial court's instruction in this case, we continue to endorse the *Smith* court's musings and improper expansion of the definition of imitation firearm by importing definitions developed in cases where the instrumentalities used to commit the crime were defined by reference to the surrounding circumstances. I believe that the analysis contained in footnote 15 of *Smith* improperly expanded the definition of "imitation firearm" by suggesting that jurors can be instructed to consider factors more properly confined to determining whether something that is *not* inherently dangerous, unlike a firearm or imitation firearm, is being used as a dangerous weapon and thus the instruction in this case was overly broad.

In Webster's New Collegiate Dictionary the word "imitate" is defined in the following pertinent ways: "To duplicate exactly," "to appear like," and "to resemble." WEBSTER'S II NEW COLLEGIATE DICTIONARY 552 (1999). Black's Law Dictionary defines the word "imitation," albeit in the trademark context, as "[a]n item that so resembles a[n] . . . item as to be likely to induce the belief that it is genuine." *Imitation*, BLACK'S LAW DICTIONARY (10th ed. 2014). Applying those definitions here, an imitation firearm would be one that so resembles an actual firearm as to be likely to induce belief that it is a genuine firearm. In other words,

a plain reading of the statute requires an imitation firearm to look like the real thing.

A plain reading of the statute also supports the idea that the term "imitation firearm" is meant to be given its plain meaning. Congress never explicitly defines "imitation" in the criminal code but consistently uses the term. For example, here, appellant was also convicted under the possession of a firearm during a crime of violence ("PFCV") statute, which criminalizes the possession of an "imitation firearm" during a crime of violence. Specifically, the statute reads:

> No person shall within the District of Columbia possess a pistol, machine gun, shotgun, rifle, or any other firearm or *imitation firearm* while committing a crime of violence or dangerous crime as defined in § 22-4501. Upon conviction of a violation of this subsection, the person may be sentenced to imprisonment for a term not to exceed 15 years and shall be sentenced to imprisonment for a mandatory-minimum term of not less than 5 years and shall not be released on parole, or granted probation or suspension of sentence, prior to serving the mandatory-minimum sentence.

D.C. Code § 22-4504.4 (b) (emphasis added).

The maxim of *noscitur a sociis* dictates that "a word is known by the company it keeps" and is "applied where a word is capable of many meanings in order to avoid the giving of unintended breadth to the Acts of Congress." *Jarecki v. G.D. Searie & Co.*, 367 U.S. 303, 307 (1961). Thus, that doctrine suggests that an "imitation firearm" would be one that physically resembles a firearm of the kind listed in the statute. The doctrine of *ejusdem generis* leads to the same conclusion: "[w]here general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." *Edwards v. United States*, 583 A.2d 661, 664 (D.C. 1990) (citation omitted).

However, the question remains whether or not an imitation firearm depends upon the victim's reasonable belief of what the object looks like under the circumstances, which is what the trial court in this case instructed to the jury. A review of the legislative history of the while-armed statute provides some guidance. In 1970, imitation firearms were added to the list of weapons included in the while-armed statute in response to the difficulty the government was having in proving that the gun used by a defendant was real, operable, and loaded at the time of the crime. H.R. REP. No. 91-907, at 68 (1970). The inclusion of the phrase

"imitation thereof" was intended to subsume any unrecovered gun within the category of weapons considered dangerous or deadly. *Id.*

The committee gave some examples of "imitation" dangerous or deadly weapons, including blank or toy pistols, antique rifles, and inoperable shotguns, which are all specifically replica weapons. It does not appear that the committee ever considered whether the brandishing of random objects to strike fear in a victim during the commission of a crime would also qualify as an "imitation" firearm. What appear to be the critical considerations, rather than a victim's fear, are the *characteristics of the object itself*, and whether it actually resembles a firearm to those viewing it.

This definition of "imitation firearm" is also consistent with how the term has been interpreted by many other jurisdictions. For example, the Virginia criminal code makes it "unlawful for any person to point, hold, or brandish" "any object similar in appearance" to any firearm. VA. CODE ANN. § 18.2-282 (2016). Other states have more specifically defined "imitation firearm" as replicas of actual firearms. For example, in Arkansas, the state defines "imitation firearm" as "a toy that is identical in appearance to an original firearm that was manufactured, designed, and produced after 1898, including only: air-soft guns firing nonmetallic

projectiles, replica nonguns; and water guns." ARK. CODE ANN. § 20-27-2301 (a) (2015).[1] In California, "imitation firearm" is defined as "any BB device, toy gun, replica of a firearm, or other device that is so substantially similar in coloration and overall appearance to an existing firearm as to lead a reasonable person to perceive that the device is a firearm." CAL. PENAL CODE § 16700 (a) (2016). In New Jersey, "[i]mitation firearm means an object or device reasonably capable of being mistaken for a firearm," N.J. STAT. ANN. § 2C:39-1 (v) (2015), and in Tennessee it means "an object or device substantially similar in coloration and overall appearance to a firearm as to lead a reasonable person to perceive that the object or device is a firearm." TENN. CODE ANN. § 39-17-1362 (1) (2015). In each jurisdiction, "imitation firearm" depends on what the item objectively looks like, not what it appears to look like to a person under any particular circumstance.

Had Congress intended that the District include objects that did not closely resemble real firearms as "imitation firearms," it could have stated so. It did not. Pursuant to the legislative intent of the term, an imitation firearm must physically conform to the characteristics commonly attributable to a real firearm. Moreover,

---

[1] An "imitation firearm" in Arkansas, however, does not include a traditional BB, paintball, or pellet-firing air gun that expels a projectile through the force of air pressure, among other things. *Id.* at (b)(2).

this showing cannot be met simply by a victim's subjective perception that an object appears to be dangerous or looks like a firearm, where the characteristics of the object do not resemble one to an objective observer.

I believe that the trial court's response to the jury's note that an imitation firearm can be any object that appears to be a firearm to the victim under the circumstances was overly broad and that regardless of the subjective belief of the person in the circumstances, there must be some evidence that the defendant had possession of a firearm or replica firearm.  But for our obligation under *M.A.P. v. Ryan*, 285 A.2d 310, 312 (D.C. 1971), I would have dissented, however this is an issue that should be addressed en banc.

FISHER, *Associate Judge*, concurring:  I agree that appellant's convictions should be affirmed for the reasons stated in Chief Judge Washington's opinion for the court, which I join.  Although our previous holdings concerning assault with a dangerous weapon and imitation firearms present some conceptual difficulties when applied to the facts of this case, I am not convinced that this is an exceptional case which merits rehearing en banc.

This was an intent-to-frighten assault, and appellant took great pains to instill fear by convincing Williams, Jones, and Frost that he had an actual firearm. Indeed, there was ample reason to conclude that appellant was brandishing a real gun. Mr. Williams, who saw the object up close and personal, "kn[e]w what guns look like" and described it as a .380 caliber pistol. Williams had "had a couple of 380s" himself.

Appellant did not testify, and he offered no admissible evidence that he was brandishing a cell phone instead of a firearm. Nevertheless, the government elicited an out-of-court statement appellant later made to Dwayne Frost, so we must deal with the record presented.

The difficulty arises because the weapon was not recovered by the police. This is far from unusual, and we have long recognized that the nature of a weapon may be shown by circumstantial, as well as direct, evidence. Moreover, the dangerousness of an object is assessed not only by the harm it may inflict directly (through the impact of a bullet or its use as a bludgeon), but also by the reaction it may provoke.

Thus, an unloaded handgun is a dangerous weapon because "a gun instills fear in the average citizen" and "creates an immediate danger that a violent response will ensue." *McLaughlin v. United States*, 476 U.S. 16, 18 (1986) (bank robbery). "[E]ven an imitation or blank pistol used in an assault by pointing it at another is a 'dangerous weapon' in that it is likely to produce great bodily harm." *Harris v. United States*, 333 A.2d 397, 400 (D.C. 1975) (assault with a dangerous weapon).

There may be a chance that the object in appellant's hand, if recovered and displayed in a still life image, would not be aptly described as a real or imitation firearm. But it was used in "a highly charged atmosphere" and it had the apparent ability to inflict great bodily injury when seen through the eyes of the victims. *Harris*, 333 A.2d at 400. In sum, the situation appellant created was fraught with danger. Any metaphysical shortcomings in the jury instruction defining an imitation firearm did not lead to an unjust conviction.